MARY HONEA, Appellant, v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY.

In Banc, November 14, 1912.

1. **NEGLIGENCE: Section Foreman: Vice Principal.** The section foreman, who ordered out a hand car and the section men, who, with him, were running the car two or three miles from the station on the track, as it wound on sharp curves amid the hills, and as a train, running rapidly on schedule time, struck the hand car, and killed one of the section men, was the company's *alter ego* as to such section men.

2. ————: ————: **Contributory Negligence: Section Man.** The rules of the company required the section foreman to clear the railroad track of hand cars ten minutes before train time, and imposed on him the duty to enforce another rule requiring section men to assist in taking hand cars from the track in emergencies, and he alone was furnished with time cards and an inspected watch in order that he might know the time of trains. He ordered the two section men on to a hand car, and he and they, on a hand car equipped with tools, had run two or three miles on a trip to inspect and repair a place in the track, which ran on sharp curves in the hills, amid trees and through cuts, the foreman and one section man facing south working the front lever, and the other also facing south working the rear lever. The foreman turned his head and saw only 350 feet away a regular passenger train, running south on schedule time, at the rate of fifty or sixty miles an hour. The men set the brake and undertook to remove the hand car in order to avoid a collision, and the last seen of the section man at the rear lever, until he

was found dead sixty feet down the embankment, he was in the center of the track, stooped over, apparently taking a step towards the car as if to take hold of it. *Held*, that the defendant was clearly guilty of negligence, and deceased was not guilty of contributory negligence, for the heart of the matter is that, without fault on his part, he lost his life because his master undertook to run a train and a hand car on the same track, at the same time, in the same direction, in violation of its own rules.

3. ———: ———: ———: ———: **Trying to Remove Hand Car.** The fact that the section man, when the alarm was given, jumped off the hand car which was under the supervision of his foreman, and was seen, in a mere flash of time that followed between his getting off and his death, partly turned, partly stooping, and partly taking a step towards the hand car that had moved on, apparently in an effort to remove it from the track, is utterly to be repudiated as evidence tending to prove contributory negligence on his part—whether his acts were the result of a confused state of mind, or whether his purpose was, soldier like, to remove the hand car to avoid wrecking the passenger train, or whether, had he not been excited, he could, after he got off the hand car, have stepped from the track to a place of safety.

4. ———: **Contributory: In Imminent Peril.** A man, in almost the twinkling of an eye brought face to face with deadly peril, menacing, imminent and about to fall, is not, after the event, to have his acts weighed by nice and speculative distinctions as to whether, on the instant, he took the course that brought about his death. The court will not narrowly or sourly measure his conduct, in order to relieve a defendant who negligently brought about his peril.

5. ———: **Assumption of Risk: Section Man.** A servant can make no valid contract to assume the risk of his master's negligence, and the law implies none. Running hand cars and trains on the same track, at the same time, at the same point and in the same direction, is not an ordinary risk incident to duties and employment of a section man, and no master can so run hand cars and trains without violating its duties to him.

6. ———: **Abandoned Issues: Instruction for Defendant Thereon.** Where plaintiff abandons certain averments of negligence stated in her petition, puts in no evidence and does not in her instructions seek recovery thereon, the court should give no instructions for defendant lugging in those abandoned issues

7. ———: **Instruction: Substance of Allegation.** An instruction which uses words that are the legal equivalents of the allegations is not erroneous. Where the petition alleges that the foreman of the running hand car which the deceased section man was help-

ing to operate "carelessly and negligently failed to observe the time of said passenger train," which overhauled the hand car, "and the approaching thereof," an instruction which tells the jury that if said foreman "carelessly and negligently caused and permitted" said section man "to remain upon the hand car and railroad track too long to prevent collision with said passenger train" expressed and necessarily implied the substance of the allegation.

8. ———: ———: ———: **Use of Word Permitted.** The unfortunate use of the word "permitted," used in both the petition and said instruction, did no harm, because it is coupled conjunctively by the word "and" with the word "caused," and thereby the jury were required to find both.

9. ———: ———: **Fencing Jury Off From Fanciful Divergence.** Juries are presumed to be sensible men, and there ought to be no presumption indulged that unless fenced in by the court's instructions at every single step they will leave the obvious path pointed out by the proof and the fair meaning of the instructions. The verdict is not to be set aside on the theory that, by the use of the word "permitted" in the instruction directing the jury to find for plaintiff if the section foreman in charge of the section men "carelessly and negligently caused and permitted" the deceased "to remain upon the hand car and railroad track too long to prevent collision with the passenger train," the jury might have concluded that they were authorized to find for plaintiff if the foreman, after the approach of the train was discovered, failed to stop the hand car and get it and the other section men on it out of the way of the train; since, under the evidence that the rules required the foreman to inspect his watch and his time card and clear the track of the hand car ten minutes before train time and he failed to do that, the instruction left to the jury a plain highway in which to travel, namely, to determine whether or not the foreman's negligent failure "caused" the accident; and if defendant wanted the jury fenced off from taking such a fanciful erroneous way, when there was a plain and sensible way open to them, it was its duty to have asked a precautionary instruction on the point.

10. ———: ———: ———: **Verdict for Right Party.** Where the verdict was manifestly for the right party, and was won in spite of many erroneous instructions given for appellant and which handicapped respondent and necessarily littered up the minds of the jury with extraneous issues, the giving of an instruction inartificially drawn ought not to work a reversal.

11. **EXCESSIVE VERDICT: $10,000: Humble Employee: Compensatory Statute: Urged First in Motion for Rehearing.** The fact that the section man was employed at $1.25 per day is no reason for holding that a verdict for $10,000 in favor of his

widow should be set aside, in a case brought, not under the penal statute (Sec. 5425, R. S. 1909), but under the compensatory statute (Secs. 5426 and 5427, R. S. 1909), where defendant at the trial put in no proof whatever. The verdict being set aside on other grounds, the court will not, in the absence of any evidence put in by defendant to show that the value of decedent's life to his wife was less than $10,000, indulge in presumptions or arguments on appeal that it was worth less.

*Held*, by GRAVES, J., dissenting, with whom WOODSON and FERRISS, JJ., concur, that under Sec. 5427, R. S. 1909, under which the suit was brought and which, in a suit by a widow for the loss of her husband, authorizes the jury to "give such damages, not exceeding ten thousand dollars, as they may deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue, and having regard to mitigating and aggravating circumstances attending such wrongful act," the action is one for compensatory damages, and it devolves upon the plaintiff to fully show the damages she has sustained; that no aggravating circumstances being shown, the only thing upon which she can have damages is the earning capacity of her husband and the probable length of his life; and that with no proof of his life expectancy, she should not be permitted to recover the largest sum permitted by the statute for the loss of a husband earning only $1.25 per day.

*Held*, also, that the statute provides for a sliding scale of damages, and does not mean that the life of a man whose earning capacity is $1.25 per day is worth as much as one whose earning capacity 'is many times that much.

*Held*, by BROWN, J., concurring, on motion for rehearing, that the damages recovered are excessive, but not so excessive as indicated in the dissenting opinion, because there was evidence that deceased at other employments earned from $1.50 to $2.40 per day, and his earning capacity is not to be measured exclusively by the wages he was receiving when killed; but, though the judgment be slightly excessive, it should not be reversed because its excessiveness was not called to the attention of the court in any of the briefs filed by defendant, and, therefore, under rule 15, it must be held to have abandoned that ground of its motion for a new trial.

Note.—In this case, after the motion for a rehearing was overruled and the opinions were certified to the Reporter, a motion *amici curiae* asking the court to set aside its judgment was filed, and upon that motion an opinion was written and filed January 13, 1913, stating the grounds why the motion should be sustained. That opinion will appear in its chronological order in a subsequent Report.—Reporter.

Appeal from Butler Circuit Court.—*Hon. J. C. Sheppard,* Judge.

REVERSED (*with directions*).

*David W. Hill* for appellant.

(1) In order to prevent a collision it was the duty of the section foreman to cause the crew and the handcar to clear the main track at least ten minutes before the arrival of the fast passenger train, which was running on schedule time, and the failure to perform this duty constituted actionable negligence. Schroeder v. Railroad, 108 Mo. 322; Stephens v. Railroad, 86 Mo. 221; Sec. 5426, R. S. 1909; Sec. 2865, R. S. 1899; Sec. 5427, R. S. 1909; Sec. 2866, R. S. 1899; Settle v. Railroad, 127 Mo. 344. (2) There is no assumption of risk in this case and it was prejudicial error to instruct the jury in that regard, as requested by the defendant. "Where section men are in transit on a handcar, it is not a case of individual volition and responsibility. Individuality is swallowed in the control and responsibility of the foreman who controls the movement of the hand car, and who is the *alter ego* of the company." Boyd v. Railroad, 236 Mo. 54; Curtis v. McNair, 173 Mo. 280; Blanton v. Dold, 109 Mo. 64; Settle v. Railroad, 127 Mo. 336; Wendler v. Furnishing Co., 165 Mo. 527; Pauck v. Beef & Prov. Co., 157 Mo. 467; Jewell v. Bolt & Nut Co., 231 Mo. 194; Obermeyer v. Chair Co., 229 Mo. 109; George v. Railroad, 225 Mo. 405; Burkard v. Rope Co., 217 Mo. 481; Zeis v. Brewery Assn., 205 Mo. 652; Charlton v. Railroad, 200 Mo. 433. (3) There was no evidence of any contributory negligence, and the court's instructions to the jury in this regard, as requested by the defendant, were confusing and misleading and grossly prejudi-

cial. Rinard v. Railroad, 164 Mo. 288; Boyd v. Railroad, 236 Mo. 54. (4) The instructions given on behalf of the defendant were entirely too favorable to defendant. (5) Sec. 5427, supra, provides that the jury may give such damages, "not exceeding $10,000, as they may deem fair and just." And in view of the fact that this court has held that $10,000 is not excessive for a leg, a verdict for the loss of the entire body for $10,000 ought not to be held excessive. Ellis v. Railroad, 234 Mo. 688. (6) The trial court abused its discretion in awarding defendant a new trial contrary to the law of the case, and the verdict of the jury should, therefore, be reinstated, with six per cent interest from the date of the rendering of the verdict. Loftus v. Railroad, 220 Mo. 479. (7) The court will observe that a new trial was awarded to the defendant on the sole ground that the court was of the opinion that it erred in giving plaintiff's instruction numbered 1 to the jury, and at the hearing of the motion for a new trial, the word "permitted" was regarded as a fatal error. This word "permitted" was used in the conjunctive form, with the word "caused," as follows: "caused and permitted"; and in reply to that we simply say this, if the foreman caused the deceased's death, he also permitted it. Defendant might have complained if the two words "caused" and "permitted" had been used in the disjunctive instead of the conjunctive form. It is not unusual for these two words to be used in cases of this character as they were used in the case at bar. Price v. Railroad, 220 Mo. 435.

*R. T. Railey, J. F. Green* and *N. A. Mozley* for respondent.

(1) Where an appeal is taken from the order of a trial court granting a new trial, the appellate court will sustain the order upon any justifiable ground ap-

pearing in the record, whether the trial court assigned such ground as its reason for the new trial or not. Crawford v. Stock Yards, 215 Mo. 402. (2) The action of the trial court in granting a new trial because instruction numbered 1 for plaintiff was given, was undoubtedly correct. This instruction, among a multiplicity of errors, contains the fatal one of not stating the law. Deceased was a section hand and an experienced one. He was familiar with the operation of passenger train No. 11. No one was required to warn him of its approach. It was his duty to look out for his own safety, and keep out of the way of harm. Evans v. Railroad, 178 Mo. 514; Loring v. Railroad, 128 Mo. 359; McGrath v. Transit Co., 197 Mo. 97; Aerkfetz v. Humphreys, 145 U. S. 418; Cahill v. Railroad, 205 Mo. 408; Degonia v. Railroad, 224 Mo. 564; Elliott v. Railroad, 150 U. S. 245; Hitz v. Railroad, 152 Mo. App. 687; Ginnochio v. Railroad, 155 Mo. App. 163. (3) Said instruction 1 covers appellant's whole case. Therefore the granting of a new trial for the error in giving it challenges appellant's right to recover at all. (4) The record discloses beyond question that deceased was guilty of contributory negligence, and appellant is, for that reason, precluded from recovering. Degonia v. Railroad, 224 Mo. 564; Cahill v. Railroad, 205 Mo. 408; McGrath v. Transit Co., 197 Mo. 97;. Hitz v. Railroad, 152 Mo. App. 687; Ginnochio v. Railroad, 155 Mo. App. 163. (5) A section hand assents to the risks incident to the usual operation of the road, and undertakes in his contract of hire to look out for his own safety. An engineer is not required to anticipate as a matter within the range of reasonable probability, that section men will remain upon the track in the very face of known danger from approaching trains, and, if they do, it is at their own risk, although no signals may be given. This is precisely what deceased did in the case at bar,

and hence respondent's peremptory instruction prayed for at the close of the evidence should have been given. Ginnochio v. Railroad, 155 Mo. App. 173; Evans v. Railroad, 178 Mo. 514; Degonia v. Railroad, 224 Mo. 564; Hitz v. Railroad, 152 Mo. App. 687. (6) The court in plaintiff's instruction numbered 1 omitted to submit to the jury the question as to whether the foreman was guilty of negligence in failing to keep in mind the running time of the passenger train, etc., as stated in paragraph 1, supra; but simply submitted to the jury in said instruction the question as to whether the foreman was guilty of negligence after the train came upon the curve, in causing and permitting deceased to remain upon the track too long. (7) Plaintiff at the trial undertook to establish a rule of the railway company, which, it is alleged, required section foremen to remove their respective hand cars from the tracks at least ten minutes before a train appeared. If there was such a rule in existence, it should have been pleaded, and the violation thereof alleged as a proximate cause of the accident. No such issue having been tendered in the pleadings, the evidence on that subject was clearly incompetent. Hicks v. Railroad, 68 Mo. 335; Drew v. Railroad, 129 Mo. App. 464; Strong v. Railroad, 62 N. W. (Iowa) 802. The issues cannot be enlarged by the evidence or instructions, nor by both combined. Christian v. Ins. Co., 143 Mo. 469. But, even if there had been a rule in existence requiring section men to clear the tracks at least ten minutes before the arrival of a train, such rule could not have conferred upon this plaintiff a right of action for its alleged violation. In other words, the violation of a self-imposed duty does not confer upon a third party a right of recovery, and does not constitute actionable negligence. Barney v. Railroad, 126 Mo. 392; Young v. Railroad, 93 Mo. App. 274. If a section foreman knows that a passenger train is due at

a given point and at a given time, without any rule or time card, it would be his common law duty as the representative of the railway company to be on the lookout for the train, as a protection to the passengers thereon. Under such circumstances, it would be his duty to remove the hand car from the track, if it could be done without jeopardizing the safety of his men, and if he had sufficient time to do so. Tested by the foregoing, we deny that the section foreman was guilty of any negligence whatever at any stage of the proceeding, from the time they left Piedmont up to and including the time of the accident. First. No witness has testified that the so-called "Mexican Special" train, which ran from Piedmont on Tuesdays and Fridays was ever mentioned or referred to in the time card alleged to have been in the possession of the section foreman, or that it had any special running time from Piedmont south to where the accident occurred. Second. There is not a syllable of testimony tending to show at what hour or minute said train was in the habit of passing either Piedmont or the place where the accident occurred. Third. The record fails to show the hour or minute when said train left Piedmont on the day of the accident, or when it arrived at the scene of the accident. Fourth. The record is entirely silent as to when the foreman and crew left Piedmont, except that it was after 1 o'clock p. m. on the day of the accident. The record is likewise silent as to the time when the accident actually occurred. Fifth. The conclusion of witness Pearson, in answer to the leading and suggestive question of plaintiff's counsel, that said train was on time, was a mere expression of opinion, and was wholly insufficient to establish said fact, for the obvious reasons that he could not read; he had no watch, and no rules had ever been given to him. Hedrick v. Railroad, 195 Mo. 122. (8) The undisputed facts in this record disclose that deceased re-

ceived warning both from the section foreman and witness Pearson that a train was approaching, when the latter was from 352 to 356 feet away. He was the first man to leave the hand car, and there is not a syllable of evidence tending to show that he fell, or was hindered in any way from leaving the track. The hand car, after he stepped off, went seven or eight feet farther, and was substantially removed from the track by the section foreman and Pearson, while deceased had nothing else to do but remove himself from the track and from in front of the train which he knew was approaching.

LAMM, J.—Suing in the Butler Circuit Court for the alleged wrongful death of her husband, John Honea, plaintiff had judgment for $10,000 on a jury's verdict. From an order granting a new trial on defendant's motion, she appealed.

The specific allegations of negligence put to the jury will be set forth in the words of the pleader in connection with a discussion of plaintiff's instruction number one. For the present, as a foreword, a mere outline of the petition will do, viz.:

On the theory that Honea was a section man about his master's business on a hand car in charge of defendant's foreman and was run down and killed by a passenger train, the petition, in one specification, counted on the negligence of the operatives of the train and asked recovery under the humanity doctrine. This specification was not supported by proof and, hence, was not put to the jury. There was another which may be summed up in the charge of the petition, thus: The train was on time and it was the duty of the section foreman to clear the track by causing and permitting section men to take the hand car from it in time to avoid a collision, but the foreman, failing to observe the time of the train and its approach,

negligently required and caused Honea to remain on the hand car and track too long to prevent a collision, whereby he was killed.

Defendant answered as follows: It admitted its incorporation; it denied generally other allegations; and then set up two defenses—assumption of risks, and contributory negligence.

It may be as well said at this point as at any other, that defendant, as to testimony, stood mute at the trial, making no effort to put in proof on its defenses or to cut down the damages.

In brief the case on the facts as developed by plaintiff is this:

Honea was an experienced section man in defendant's employ in Wayne county, say, thirty-five years of age, and earning at the time a dollar and a quarter a day. He was under a foreman named Joe Daniels who, in turn, was in charge of the hand car presently mentioned. Defendant ran a regular south-bound passenger train, known as the "Mexican Special," on Tuesdays and Fridays of each week. Its name and days returning north are blind. Its time at Piedmont en route to the south is some after one o'clock p. m., but the exact schedule time is not disclosed. A bit after one o'clock of a winter's afternoon in 1908, John Honea and a fellow workman named Pearson were ordered on a hand car by Daniels, their foreman, in the railroad yards at Piedmont, and they, including the foreman (and with him in charge), started south on the car on an inspection trip over the section. Besides the three men, the hand car was equipped with some iron and steel tools—a jack, lining bars, claw bar, shovels, spike mauls and tamping bars—and the trip was partly because a place in the track needed fixing. At about two miles south of Piedmont the hand car was overhauled by said "Mexican Special" running fifty or sixty miles an hour and Honea was killed.

In that region defendant's road runs on sharp curves in the hills, amid trees and through cuts and the look ahead or back is not far. Under the proof the train was on time. The men on the hand car faced south away from the train—Honea working its rear and the foreman and Pearson its front lever. In running round a very sharp curve Pearson got a premonition from what he thought was the echo of a whistle that a train was coming behind them. At the same instant the foreman and Pearson turned their heads and discovered the "Mexican Special" two telegraph poles, say, 350 feet, bearing down on them from their rear. At that time the hand car was rolling about six or eight miles an hour. We have only a confused account, giving a somewhat blurred picture, of the scene, for the drama was played out in a moment. To use the vernacular of Pearson, he "hollered:" "The car will kill us, Joe. My goodness!" The foreman "hollered:" "She's got us, boys!" Thereat the foreman "jumped" on the brake and witness saw Honea jump off at the rear, and the hand car then either rolled or slid seven or eight feet, when the foreman and Pearson jumped off before it came to a dead stop. We gather that the first impulse of the foreman was to run, but, changing his mind in a flash and in great excitement he and Pearson grabbed the handles of the hand car and got one end of it from the track, when the locomotive was on them striking it a slanting blow and tumbled it and the two men, or at least one of them, down the dump. The foreman was present at the trial as defendant's witness, but, as said, did not testify for defendant and was not called to testify for plaintiff, so that the case stands on material points on the testimony of Pearson and he got (what we take as) merely a glimpse of Honea. As said, he saw him jump off the car after the brake was set, he remembers seeing him about the center of the track, apparently with his right side somewhat towards the train,

stooped over and in the act, as witness thought, of tak-
ing a step towards the car as if to take hold of it, but
the car had rolled on and the next he saw of Honea,
a moment afterwards, his lifeless body lay at the foot
of the dump and sixty feet south of where he was
struck.  This bit of the record tells at one stroke
enough of the story on that head:  "Q.  What was
the last you saw him doing?  A.  When he stepped
down off the car, was the last thing I saw him doing;
and I realized the danger that I was in and I stuck
my head down to keep from realizing how close I was
to my death.  I was in a stooping position and couldn't
see what anybody else was doing.  Q.  Did you see
him stoop to get hold?  A.  Yes, sir; he stepped off
straight back (indicates); the last time I saw him he
was going like this (indicates); and I was in a stoop-
ing position, and in a strain and in a hurry, and that
was the condition I was in.  Q.  Was he stooping over
towards the car?  A.  Yes, sir; the last time I saw
Honea that was where he was at, in the center of the
track."

Defendant had a rule to the effect that the section
foreman should clear the track of hand cars ten min-
utes before train time.  The instructions to the section
men were to assist in taking hand cars from the track
in emergencies.  The uncontradicted testimony clearly
shows that it was made the duty of the foreman to
enforce that rule.  To that end he was furnished with
a time card and with a watch inspected by defendant's
inspector.  The section men had no such watches or
time cards.  On this occasion Pearson had no watch at
all, and Honea's was described by the witness this
way:  "Well, he had a little old—one of these dollar
clock watches.  It is called a watch.  There is no al-
lowance to be made on it."

Speaking of the duty of the foreman, the rule,
the time card, the watch, Pearson testified further as
follows:  "Q.  Whose duty was it to keep track of the

schedule of these trains, and have the hand car put in the clear for them? A. Our section foreman's duty, because he was the man they gave the time card to, kept the time card in his pocket; and also they required him to have a timepiece—a watch, you know. Q. And keep it in good repair? A. Yes, sir, for I have seen him go to the watch man in the jewelry store, and have his watch examined. Q. And did he have such a timepiece on that day? A. Yes, sir, he did. Q. That watch inspector was the inspector of this company, wasn't he? A. Yes, sir. . . . By the Court: The question is: do you know what the rule was? A. Yes, sir. Q. Now, tell the jury. A. Supposed to be in the clear as much as ten minutes. Q. Whose duty was it to get you in the clear? A. Our foreman's. Q. Did the foreman do it in that case? A. No, sir.''

Referring to the necessity of getting the hand car and tools out of the way of the train the witness testified: ''Q. Why were you getting this car off? A. In order to save the car; and also save having that there collision, them track tools—my intention was— on that sharp curve, there had been wrecks on that same curve, a little trouble, some; and my intention was to put them in the clear if I could.''

Further as to the duty of getting hand cars out of the way of trains, the witness made answer to questions as follows: ''Q. I'll ask you if it was a part of your duties as section man, when a train was approaching, to get your hand car off? A. Yes, sir. Q. That is the only way you had of getting the car off— was lifting it off? A. Yes, sir, drag it off; any way to get it off. Q. Those were your instructions from the company? A. From the foreman.''

Further along appears this: ''Q. On whom did you and Honea rely to keep you posted on these trains, when they were due, and when to get in the clear for them? A. Well, on the foreman, I did. Q. And Honea did, too; didn't he? A. Yes, sir. By Judge

Green: How do you know he did? A. Well, I know about one collision. We had been in a pretty tolerable close place before; and we kept pulling until he demanded us to take the car off; that's what I am going by. And we got in the clear that load of poles. Q. Was this that same foreman? A. Yes, sir.''

The court sustained the motion for a new trial on the ground of error in plaintiff's instruction number one—of which presently.

It is argued at our bar in support of the order granting a new trial that there can be no recovery because of two bars put up by the law, to-wit: contributory negligence and assumption of risks. On this record and on those contentions we make the following observations:

Honea was in the line of his duty as a servant of defendant and was killed while about his master's business and not his own and in the unsafe field provided by the master for him to labor in. The master key unlocking the heart of the matter is that, without a particle of fault on his own part, he lost his life because the master negligently undertook to run a train and hand car on the same track, at the same time, in the same direction, at a speed as sure to result in the train's overtaking the hand car (if not taken off) as that ebb tide follows flood tide or day follows night in nature. There could be no two ways about it that the thing that happened was bound to happen, namely, that the hand car would be caught. There are three things said by the answer to stand between the master and liability, viz.: assumption of risks, the contributory negligence of Honea and the general denial. The general denial is brushed away by the proof. No contributory negligence was shown. This, because: It is no overstatement to say there was no evidence of any probative force tending to show it in Pearson's narrative. The fact is that Honea and the hand car were under the supervision of the section foreman, who,

*pro hac vice,* was the master's *alter ego.* The fact is that when the alarm was given, the hand car, which could not run away from danger, was slowed down, so that Honea jumped off at the rear. That he did jump off and was seen, in the mere flash of time that followed between his getting off and his death, partly turned, partly stooping, may be, and partly taking a step towards the hand car that had moved on (if that be so), is to be utterly repudiated as evidence tending to show the contributory negligence of Honea. A man, in almost the twinking of an eye, brought face to face with deadly peril, menacing, imminent and about to fall, is not (by just men) after the event to have his acts weighted as by the scales of a goldsmith, or viewed through a microscope, or dissected as by a surgeon's knife, or analyzed by metaphysical splitting of hairs as by the subtle rules of a logician, or tested, as chemists do matter, by acid. The rule to go by in that plight is: Put yourself in his place. To my mind, in getting at defendant's liability, it matters not a whit whether Honea had, at the instant, an impulse to follow the hand car like a soldier to aid his comrades in removing it from the track to save the lives of the people on the train, or whether he was momentarily confused by excitement and had no definite object at all, or had not yet got his balance after leaving the moving hand car. A court of justice, moving on common sense lines, is not to quibble or *niggle* about his conduct and with speculative daintiness measure it by two or three pulse beats and construe it sourly and narrowly in order to relieve a defendant who negligently brought a situation about that would try the soul of any man. Nor is it worth while to speculate on whether Honea, hard beset by death, by great good luck (utterly forgetting the welfare of the train and its passengers) could have gathered his wits and muscles in the nick of time and jumped sideways out of danger. May A wrongfully put B in sudden peril of his life and then

say to B's widow: Madam, your husband was a slow coach? He was fat-witted or panicy? He lacked a chilled-steel nerve? His judgment was not cool and steady enough? Nor do I care for the fortuitous circumstance that Honea's comrades were not killed. That some are saved, as though brands plucked from the burning, in such a flurry and riot of danger, is no evidence that the one not saved died as the fool dies, to-wit, by acts sounding to folly and negligence. As we have said on facts somewhat similar:

"We may not be allowed to review this transaction from the standpoint of the way it looks to us, glancing back. We *know*—he did not know. It must be judged of by the way it would look to a reasonable man before the jump. Being suddenly called upon to consider a question of life and death in the face of a danger imperiously menacing him, he acted on appearances under a natural and allowable impulse of self-preservation and the law will not concern itself over-closely in scrutinizing and gauging his judgment, because men facing confusing perils sprung on them quickly are not called on to act with coolness and precision. The impelling question is whether appellant's own skirts are clear of blame for the fire, rather than whether respondent acted with good judgment in escaping its flames, and, in our view, the contributory negligence of respondent may be considered out of the case under the facts presented for adjudication." [Root v. Railroad, 195 Mo. l. c. 357.]

So we say here—under the facts, there was no contributory negligence on Honea's part. The dominating fact here is the negligence of defendant and that alone. Boyd v. Railroad, 236 Mo. 54, is in point, *arguendo*.

Nor is the doctrine of assumption of risks in the case. Deceased could make no valid contract (and the law implies none) to assume the risk of his master's negligence. Running hand cars and trains on

the same track, at the same time and at the *same point*
is not an ordinary risk incident to railroading. A risk
raised by such combination of things (when the master
is in charge of the hand car) is one springing from the
master's want of care. Here there was a rule. But
rule or no rule, no master could run hand cars and
trains that way without violating a duty to its serv-
ants. As put in Charlton v. Railroad, 200 Mo. l. c. 433:
"So, too, in the assumption of risks by a servant it is
well to consider a certain assumption by the master,
and that is, that the master impliedly contracts with
the servant that he will exercise ordinary care to pro-
tect such servant from injury by providing a reason-
ably safe place for him to work. When these two
assumptions are considered as proceeding hand in
hand, it will be perceived that the risks assumed by
the servant are those risks alone *which remain after
the master has exercised ordinary care.*" In Curtis
v. McNair, 173 Mo. 270, the right doctrine is expounded
in the light of our repeated adjudications. [*Q. v.*]

At this point it is a little worth while to see what
obstacles were planted in the way of the widow's suit
for her to overleap. Although the questions of con-
tributory negligence and assumption of risks had not
a foot to stand on, and were wholly beside the case
made, yet her case was made to run the gauntlet of
them both in a set of argumentative instructions. Not
only so, but although plaintiff abandoned the averment
of her petition based on the negligence of the train
crew, put in no proof thereon and did not in her in-
structions seek recovery under the humanity doctrine,
yet by inadvertence those abandoned theories (with
others not within the pleadings at all) were also for-
mally instructed on, thereby confusing and littering
up the minds of the jury with extraneous issues and
notions to the detriment and hazard of her meritorious
case—witness six instructions given for defendant, to-
wit:

"4. The jury are instructed that when John Honea accepted employment as a section laborer on defendant's line of railroad it was a part of his duty to go to and from his work upon a hand car, and that in so riding on said hand car, he assumed and took upon himself all of the risks incident to such employment, among which was the risk of being overtaken by trains, on defendant's road. It was not the duty of defendant's section foreman to warn said Honea of the approach of such train, and you cannot find a verdict for the plaintiff in this case on account of the failure of defendant's section foreman to notify Honea of the approach of the train which struck deceased.

"5. The court further instructs the jury that defendant's employees in charge of the train had the right to presume that Honea and the other section employees would look out for themselves and keep out of danger. It was not negligence on the part of said train employees to run the train at a high rate of speed, and you cannot find a verdict for plaintiff on account of the manner in which the passenger train was handled by defendant's employees.

"6. The court further instructs the jury that it was not an act of negligence on the part of defendant's employees to run its passenger train over the portion of the road on which the hand car was being operated, and the plaintiff cannot complain of the character of the road at that place, nor of the conduct of the employees in the management of the passenger train, as defendant's employees had the right to run the train at such a rate of speed as they deemed proper, due regard being had to the safety of the passengers on said train. And you cannot find a verdict for plaintiff, unless you find from the evidence that defendant's employees in charge of the engine saw the deceased John Honea on the track in the act of removing the hand car in time to have prevented injury to him and that they failed to exercise due care to

avoid striking him after discovering his peril and danger.

"And you are further instructed that said train employees were not required to stop the train, after discovering the peril of said Honea, if the attempt to stop the train would have been attended with danger to the passengers riding thereon.

"7. The court further instructs the jury that, if you find from the evidence that other section employees on the hand car got off the track in safety and that John Honea by the exercise of due care and caution for his own safety could also have gotten off the hand car, or did get off the hand car in time to avoid being struck by the train and that he was thereafter struck in consequence of his remaining on the track, then in that event the plaintiff is not entitled to recover in this case.

"8. The court instructs the jury that, if you find from the evidence that the death of John Honea was the result of an accident in consequence of his being struck by a train, if you find that his death was caused in part by the negligence of the train employees as well as partly by his own negligence or want of care, then and in that event the plaintiff is not entitled to recover.

"9. The court further instructs the jury that although you may believe from the evidence that the foreman, Daniels, required plaintiff's husband to ride upon the hand car while said hand car was being moved upon defendant's track; yet that fact of itself does not entitle plaintiff to recover, for it was the duty of plaintiff's husband to keep a watch for his own safety; and if you find that by listening he could have heard the train, or by looking he could have seen it; or if you find that he did see it, and got off of the hand car in time to save himself and was struck by the train in consequence of his remaining on the track, then your verdict must be for defendant."

We shall not stop to analyze those instructions one by one. In his zeal learned counsel, by inadvertence, led the court into error. They could not well be more evenly misleading, more evenly argumentative and mischievous than they are, taken as a series or one at a time. One excuse for reproducing them is that they may serve as models of how *not* to instruct a jury in a case with facts like the one at bar. Every one of them was an arrow aimed at the right of the case, under the facts of this record and on the theory on which plaintiff sought her recovery, viz., the negligence of the foreman. The master himself in the person of Daniels had charge of that hand car and of Honea. The question was: How did he acquit himself? It was error to give any of them and if plaintiff had lost her case the verdict must have been set aside *instanter*.

Thus undeservedly afflicted with troubles and tribulations, plaintiff "plucked the flower, safety, from the nettle, danger," and then—lost it. This, it is said, on one of her own instructions. So, her case (we borrow Moore's figure),

"That stood the storms when waves were rough,
Yet in a sunny hour fell off
Like ships that have gone down at sea
When heaven was all tranquillity."

(*Nota bene,* by way of a sidestep: There be those who say that poetry has no place at all in jurisprudence or legal exposition. *Quoad hoc,* it may be said: The French have a saw: He who excuses himself accuses himself. Not caring to fall foul of that adage, we enter no excuse, but point to the venerable *dictum* of the Mentor and Master, Sir Edward Coke (Co. Litt. 264): "The opinions of philosophers, physicians and poets are to be received and alleged in causes." *Quod erat demonstrandum.*)

It is of judicial interest to see how that thing happened. It is argued that one of her instructions did not follow her petition in essential matter. Let us look to that:

| *The petition.* | *The instruction.* |
|---|---|
| ". . . . that the said passenger train, which collided with John Honea and the hand car as aforesaid, was on time, and that it was the duty of Honea's foreman to have caused and permitted John Honea and his associates to take the hand car and leave the track before said train had time to collide with either of them, but that the defendant's foreman, in said passenger train and the other section men with the hand car, carelessly and negligently failed to observe the time of said passenger train and the approaching thereof, and carelessly and negligently required, caused, and permitted the said John Honea to remain upon said hand car and railroad track too long to prevent collision with said passenger train, and as a result of said carelessness and negligence upon the part of the defendant's foreman in charge of John Honea, coupled with the carelessness and negligence of the officers, agents, servants and employees of defendant in charge of defendant's passenger train and engine which struck and collided with John Honea and the hand car used by him, caused the death of the said John Honea, . . . ." | "The court instructs the jury that if you believe and find from the evidence in this cause that it was the duty of defendant's foreman to have caused and permitted John Honea and his associates in the employ of the defendant to take the hand car and leave the track before train number eleven could collide with the hand car and section men, but that the defendant's foreman, in charge of Honea and other section men, with the hand car, carelessly and negligently caused and permitted John Honea to remain upon the hand car and railroad track too long to prevent collision with said passenger train and as a result of said carelessness and negligence upon the part of defendant's foreman, in charge of Honea, defendant's passenger train or engine thereof struck and killed Honea, about January 28, 1908, in Wayne county, Missouri, and that the defendant's railroad runs through Butler county, Missouri; and that plaintiff was Honea's lawful wife at the time of his death and that he was killed without any negligence on his part, then your verdict will be for the plaintiff, Mary Honea." |

The vice of the instruction is said to be in omitting all reference to the allegation in the petition that the foreman "carelessly and negligently failed to observe the time of said passenger train and the approaching thereof." On that omission we make some observations, viz.: That allegation is carried over in substance and necessarily implied in the allegation

that followed, to-wit, that the section foreman care-
lessly and negligently caused and permitted Honea to
remain upon the hand car and track too long to pre-
vent a collision. In legal effect the one includes the
other in reasonably fair construction. The latter al-
legation is covered by the instruction and, it seems
to me, in final analysis, it is the real, the ultimate
ground of negligence complained of and put to the
jury. In the proof of the charge made in the petition
and thus incorporated in the instruction, the rule of
defendant (testified to without objection) requiring
the track to be cleared of hand cars ten minutes be-
fore the time of the passenger train, the fact that the
train was on time, that the section foreman had a
time card and watch regulated by defendant, that part
of his duty was to make the clearance and that he
failed to do so—we say the proof on one and all of
those things is after all but evidence tending to prove
the ultimate and justiciable fact that defendant,
through its section foreman, negligently caused Honea
to remain on the hand car and track and come to his
death thereby. The unfortunate word "permitted"
is used loosely in both petition and instruction, but it
did no harm, because it was coupled by the conjunc-
tive conjunction "and" with the word "caused." The
jury had to find *both* and that was well enough. We
look on the word "caused" as the master-word. That
word carried the jury back to the whole body of the
proof. Unless defendant through its foreman caused
deceased to remain too long in peril, plaintiff ought to
be cast—otherwise, then otherwise.

But it is argued that the jury would conclude from
the instruction that the failure of the section foreman,
after the approach of the train was discovered, to stop
the hand car and get it and his men out of the way of
the train was within the purview of the language;
that there was no such ground of recovery possible
under the facts, and therefore the verdict of the jury

must be referred to that erroneous theory. But are the men in the box not men of sense? Why speculate on whether they adopted such narrow and unlikely theory when under the evidence there was a plain, broad highway leading in another and a right direction, to-wit, in the foreman negligently performing his duty to inspect his watch and his time card and clear the track according to rule? That was the obvious, open and sensible view for the jury to take of what "caused" the accident. If defendant wanted the jury fenced off from taking some other fanciful view, why did it not ask an instruction of its own on that point? If we were once to adopt the rule of reversing cases where a word or a phrase, standing alone, admits of a double meaning, one of which is mischievous and the other is not, we would affirm but few judgments. Men, under oath in a box, taking a sober and vital part in the administration of justice, are presumed by the law to be reasoning men, apt in solving the problems of life by the aid of reason, i. e., everyday sense. There ought to be no presumption indulged that unless fenced in by the court at every single step they will leave the obvious path pointed out by the proof, and within the fair meaning of the instructions, and wander off into a side path outside the proof.

Moreover, conceding the instruction was somewhat inartificially drawn, yet with the broad current of the case running in favor of plaintiff, with defendant putting in no proof at all, explaining nothing, denying no evidence, can we say that the "substantial rights of the adverse party were affected," or that the "merits of the action were materially affected?" The statutes hold out a steady lamp to guide appellate courts in administering justice in that particular. We read our duty in the light of those statutes, viz.:

Sec. 1850, R. S. 1909, reads:

"The court shall, in every stage of the action, disregard any error or defect in the pleadings, or pro-

ceedings which shall not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

Sec. 2082, R. S. 1909, reads:

"The supreme Court, or Courts of Appeals shall not reverse the judgment of any court, unless it shall believe that error was committed by such court against the appellant or plaintiff in error, and materially affecting the merits of the action."

The verdict of the jury was so manifestly right and was won by plaintiff so hobbled and handicapped by erroneous instructions given for defendant, that it ought to take more error than can be found in her instruction to upset her verdict.

It is argued the verdict is excessive, and that, as the point was made in the motion for a new trial, the order granting one may stand on that foot, although the court did not put its action upon that ground. If this suit were under the penal statute, which it is not, then this contention would seek the statute, providing (R. S. 1909, Sec. 5425) that railroad corporations causing injury to other persons from which death ensues, "shall forfeit and pay as a penalty, for every such person, employee or passenger so dying, the sum of not less than two thousand dollars and not exceeding ten thousand dollars, in the discretion of the jury, which may be sued for and recovered," etc.

We think, on further deliberation, the case was not brought or tried under the penal statute, but under sections 5426 and 5427 that are not penal. It is sufficient to hold in this case that if there were circumstances of mitigation or aggravation, the jury had the facts and all of them defendant cared to elicit; for defendant, as said, laid its hand on its mouth and put in no proof whatever. Some weight must be given that fact. The jury being entitled to deal with the statute as having compensatory features, this particular jury had all the facts this particular defendant thought nec-

essary to submit to them on that phase of the case. It had also, on that theory, all the instructions defendant asked, and plaintiff's instruction on that score is well enough.

It seems clear on principle that the order granting a new trial can not stand on the proposition that the verdict was excessive. Concede decedent was of humble rank, was employed humbly on a humble wage. The proof goes to that extent and means he was a poor man in pocket. Whether he had a family is left dark. Now, are we told *as a matter of law* that the mere humbleness of the dead man cuts down the value of his life to his widow below $10,000? However humble, may we not presume, in the absence of testimony to the contrary, as here, that he came up to full measure in every quality of worth—worth as a man, worth as a father (if he was one) and worth as a husband? I think so, and take leave to say that I feel a certain .pride (if a judge may have pride) in holding, under recognized legal precepts, that odious things are never presumed without proof. So, shall we assume that his present earning capacity (if that is to be taken as the guide) would always remain at $1.25 per day? Moreover, is the law so deadly cold as to gauge the value of a life alone by the dollars and cents the dead man was earning? That is one standard, but that it is the only one known to the law I can not agree to. Be that as it may this defendant, who did not care to even try to whittle away decedent's value to his wife by *evidence before the jury,* ought not to be heard to do so by *presumption or argument on appeal.* It, silent, below, left the jury to fix the value of the man's life on the proof adduced and the instructions given and should abide the event.

We do not mean to say that the jury's award of damages is beyond the power of the court to correct if it should appear that the discretion given the jury under this statute has been abused. The discretion

given the jury in such case is like the discretion given the trial court in other matters it is a sound discretion and when so exercised is not subject to review in the appellate court, but when it appears to have been abused the court will give relief.

In view of the premises, the order granting a new trial was erroneous. It should be reversed with directions to reinstate the verdict of the widow, as of its original date, and to enter judgment thereon. It is so ordered. *Valliant, C. J.,* and *Kennish* and *Brown, JJ.,* concur; *Graves, J.,* dissents in an opinion filed, in which *Woodson* and *Ferriss, JJ.,* concur.

## OPINION ON MOTION FOR REHEARING.

GRAVES, J.—Upon the last day of our April term there was pending in this case a motion for rehearing and upon that motion I had prepared my views, to the effect that a rehearing should be granted for the reason that the principal opinion then on file decided the case upon a theory not involved in the case at all. In other words the opinion was written upon the theory that the case was under what is now section 5425, Revised Statutes 1909, the penal section, when in truth and fact the case is under what are now sections 5426 and 5427, Revised Statutes 1909, the compensatory sections.

Discovering his error the writer of the principal opinion upon the last day of the term, presented a revised opinion changing the theory of the opinion as first written, and I took time in which to reformulate my views of the case, and hence the motion for rehearing passed over for that purpose. In compliance with the leave granted me I submit the following:

In the trial of the case *nisi* the humanitarian theory was abandoned by the plaintiff. That left in the petition the following:

"Plaintiff further states that as a result of the carelessness and negligence and unskilfulness of

. . . the foreman in charge of said hand car, as aforesaid, she has been deprived of the support, comfort and society of her said husband, all to her damage in the sum of ten thousand dollars, for which sum defendant is liable to plaintiff by virtue of Secs. 2865 and 2866, of the Revised Statutes of the State of Missouri, of the revision of 1899, and by virtue of an amendment of the latter section by an act of the General Assembly in the year 1907 (Acts 1907, p. 252)."

The above sections are now Secs. 5426 and 5427, R. S. 1909. They authorized a recovery of compensatory damages only. They are not in any sense penal statutes, and have never been so construed.

Not only did plaintiff's petition plant her cause upon the compensatory statutes, but *such* is the theory of her instructions. The material part of her principal instruction reads:

"The court instructs the jury that if they find for the plaintiff they will assess her damages at such sum as in their judgment will be a fair and just compensation to her for the loss of her husband, not exceeding the sum of ten thousand dollars, having due regard to any mitigating circumstances offered in evidence and taking into consideration the age of the deceased, his capacity to labor and probable earnings."

This instruction in under Sec. 5427, R. S. 1909, and not under the penal section, namely, Section 5425. Section 5427 reads:

"Sec. 5427. Damages accruing under the last preceding section shall be sued for and recovered by the same party and in the same manner as provided in section 5425; and in every such action the jury may give such damages, not exceeding ten thousand dollars, as they deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue, and also having regard to the mitigating and aggravating circumstances attending such wrongful act, neglect or default."

Under this section the plaintiff must show her damages. On the other hand the defendant may show the mitigating circumstances, if any there be.

Further the action being one for compensatory damages, it devolved upon plaintiff to fully show the damages sustained. She has not shown damages to the exorbitant sum of $10,000. The excessiveness of the verdict was a ground in the motion for new trial. Such ground was well taken and the action of the trial court in granting a new trial can be sustained for this reason if for no other. We believe the instruction condemned by the trial court in its order granting a new trial was properly condemned. The instruction is awkwardly worded, and to say the least of it, is misleading.

The action of the trial court in granting a new trial stands upon a different basis from that of an appellate court. Such court has a wide discretion, and such discretion should not be disturbed here, unless it has been grossly misused. Our brother LAMM, in McCarty v. Transit Co., 192 Mo. l. c. 401-2, has well stated the situation of the trial judge, thus:

"Considering the case from this point of view, it must not be lost sight of that a jury may not give any verdict it pleases. Its verdict is first subject to the trained judicial discretion of the trial judge, and his judicial discretion, so exercised upon the verdict, will not be interfered with on appeal except it be unmistakably unwisely exercised. [Bank v. Armstrong, 92 Mo. l. c. 279, et seq.; Bank v. Wood, 124 Mo. l. c. 76-7; Kuenzel v. Stevens, 155 Mo. l. c. 285; McCloskey v. Pulitzer Pub. Co., 163 Mo. l. c. 33, and cases cited.] The wise exercise of this judicial discretion on the part of the circuit judge has always been encouraged by this court—a discretion exemplified by Justice GRIER in his celebrated dictum that 'it takes thirteen men in this court to steal a man's farm; twelve in the box and one on the bench.'

"The trial judge stands peculiarly close to the fountain-head of legal justice. He is the high priest presiding at the very altar of the temple. To him it is given to hear the intonation of the voice of a witness, to see his manner, his cast of countenance, the glance of his eye, the behavior of the jury, their intelligence, their attention and the whole network of small incidents creating an atmosphere about a case and tending possibly to a perverted result or otherwise, none of which can be preserved in the bill of exceptions and sent here, and in him, therefore, should exist the courage to prevent a miscarriage of right. His viewpoint is entirely different from that of an appellate court. See the animated language of WAGNER, J., in Reid v. Insurance Co., 58 Mo. l. c. 429, et seq."

In the earlier case of Schmidt v. Railroad, 149 Mo. 282, our present Chief Justice thus tersely spoke: "The trial judge holds in his hands more than any other tribune the power to shape the trials of cases to accomplish the ends of justice. One of the chief means at his disposal is the power to grant new trials and he ought to exercise it whenever in his judgment unfair advantage has been obtained at the expense of justice."

So we say in this case: the trial judge was at the very seat of justice. The verdict in this case disturbed his idea of justice. He set it aside and it should so remain: It matters not that he may have assigned a wrong reason for his action if there be a good reason covered by the motion for a new trial.

We insist that the exceedingly high verdict in this case is not sustained by the evidence for the plaintiff. Under the statute (Sec. 5427, R. S. 1909) the damages assessed by the jury must be "with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue, and also having regard to the mitigating and aggravating

circumstances attending such wrongful act, neglect or default.''

No aggravating circumstances were shown by the plaintiff and hence the damages cannot be enhanced for that reason. The only thing upon which she can have damages is the earning .capacity of the deceased and probable length of his life. He was earning one dollar and twenty-five cents per day, and yet on this proof she has recovered the highest amount which can be recovered in a case under these statutes. Had her husband been earning ten dollars a day she could not have recovered one whit more than she did in this case. I do not endorse the idea seemingly announced by our learned brother that the widow of a man with an earning capacity of $1.25 per day can or should recover under these statutes a sum equal to that which can or should be recovered by the widow of a man whose earning capacity was $10 per day. The statute does not mean that. It has a sliding scale of damages and was properly intended to cover all cases, but to cover them rightly and justly under the facts of each case. The greatest recovery allowable is ten thousand dollars. This includes the aggravated cases. When the Legislature fixed this sliding scale, and when it provided for aggravating circumstances as an element to enhance the damages, and when it further fixed the highest recoverable sum at ten thousand dollars, it was never intended that the widow of a man with the limited earning capacity of $1.25 per day should recover the full limit of the statute in a case without a single aggravating circumstance. The verdict in this case outrages the very statute under which it was recovered. To permit it to stand would be to make mockery of the law, and enter upon the records one more travesty upon justice.

As stated before, the excessiveness of this verdict was properly urged in the motion for a new trial. It is vehemently urged here. The trial court has

granted a new trial and excessiveness of this verdict is a good ground for that action of the trial court. What reason the learned trial judge assigned for his ruling is immaterial here, so long as there is one good ground in the motion for a new trial.

The motion for rehearing in this court should be sustained to the end that we may, upon another hearing, enter up a judgment sustaining the trial court in granting a new trial, *nisi,* and to the further end that upon such new trial below a right verdict in the case may be obtained, and not one bearing upon its face the evidence of poison and prejudice in the minds of the jury.

*Woodson* and *Ferriss, JJ.,* concur in these views.

## OPINION ON MOTION FOR REHEARING.

BROWN, J.—This case has been pending in this court since February 17, 1909, and much judicial energy has been expended in sundry efforts to dispose of it according to correct principles of law. It was first heard in Division One at our October term, 1911; and an opinion written by Commissioner BOND, recommending that the cause be remanded for a new trial. That opinion was not adopted by a majority of the judges composing Division One; so the case was transferred to the Court in Banc.

It was heard in Banc at our April term, 1912; and in an opinion filed by LAMM, J., it was reversed and remanded, with directions to the circuit court to enter judgment for plaintiff on the verdict of the jury.

The cause now stands on a motion by respondent for a rehearing, in which motion we are strongly urged to affirm the judgment of the circuit court granting a new trial, on the ground that the verdict of the jury is excessive.

I am of opinion that the verdict is excessive; but not to the extent indicated in the opinion of my

learned brother GRAVES, who figures the earning capacity of plaintiff's deceased husband at only $1.25 per day. He has overlooked the evidence at pages 56 and 57 of the abstract, which shows that deceased knew how to perform other kinds of work besides that of a section hand; that he had worked as a lumber-stacker, and received therefor from $1.50 to $2.40 per day.

I do not understand that the earning capacity of a man can be measured exclusively by the wages he is receiving when killed. If so, there could be no recovery for killing or injuring a man who was temporarily out of employment.

While the judgment may be, and I believe is, slightly excessive, I think the motion for rehearing should be overruled, for the reason that the issue of excessiveness of the verdict was not called to our attention by either of the briefs filed by learned counsel for respondent.

It was certainly the duty of respondent to point out in its brief the excessiveness of the verdict, and cite us to the law which designated the correct measure of damages.

During the last fifteen years our rule number 15 has contained the following provision:

"All briefs shall be printed and shall contain separate and apart from the argument or discussion of authorities, a statement, in numerical order, of the points relied on, together with a citation of authorities appropriate under each point. And any brief failing to comply with this rule may be disregarded by the court."

It seems that the Kansas City Court of Appeals has a similar rule, which it enforces. [Schwald v. Brunjes, 139 Mo. App. 516.]

This rule is simple, and reasonable. It is also necessary, because it compels litigants to marshal and bring forward in one brief all the points and authori-

ties upon which they rely to secure favorable action of this court on their contentions. If we allow litigants who have urged many grounds against the validity of a verdict in the lower court to bring those grounds or issues forward one at a time, the business of this court will be needlessly congested and delayed.

It is the settled policy of this court to require litigants to try their appeals on the same theory they adopted in the trial court, and new issues cannot be raised for the first time on appeal. [Horgan v. Brady, 155 Mo. 659, l. c. 668; Brier v. Bank, 225 Mo. 684.]

In Horgan v. Brady, *supra,* we said: "The plaintiff is limited on appeal to the theory on which she tried her case in the lower court, for it would be manifestly unjust to convict that court of error in respect to matters upon which it never ruled, and upon claims or rights that were never called to its attention. This is axiomatic in appellate practice, and has been the accepted rule, certainly since 1868."

It would only be a just, reasonable and necessary expansion of that doctrine to require litigants who secure more than one hearing of the same appeal to confine themselves to the issues they choose to present to us in the first hearing. If we are to refrain from "convicting" trial courts of errors not called to their attention, why should we not as a court in banc also refrain from "convicting" one division of this court of overlooking assignments of error not called to its attention in the briefs of litigants?

It is a well known fact that all lawyers incorporate in their motions for new trial and in arrest many points which upon mature reflection they abandon and do not present to the appellate courts at all.

Our rule before quoted requires each litigant to present to us in his brief all the points upon which he relies; and I fail to see why that rule is not just as binding as the rule which requires a litigant by his

motion for a new trial to call the lower court's atten-
tion to all the errors of which he complains.

The defendant (respondent) has had a fair trial in
the circuit court and two hearings in this court.  Sev-
eral hundred other litigants who have never even been
accorded one hearing have been patiently knocking at
the door of this court for more than two years, humbly
beseeching us to give them relief; therefore, as an act
of justice to ourselves and  other litigants,  I think
the motion for a rehearing in this cause should be
overruled.