ANTHONY MRAZEK v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—111 S. W. (2d) 26.

Division One, December 14, 1937.*

*NOTE: Opinion filed at May Term, 1937, July 30, 1937; motion for rehearing filed; motion overruled at September Term, December 14, 1937.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Oscar Habenicht, Foristel, Mudd, Blair & Habenicht* and *Harry S. Rooks* for respondent.

HYDE, C.—This case, recently reassigned to the writer, is an action for damages for personal injuries brought under the Federal Employers' Liability Act (U. S. C. A. secs. 51-59). Plaintiff had a verdict for $15,000, and defendant has appealed from the judgment entered thereon.

Defendant assigns as error the refusal of the court to direct a verdict in its favor. Both parties concede the applicability of the Federal Act. Considering plaintiff's evidence and defendant's evidence favorable to plaintiff, the following facts were shown. Plaintiff was a freight check clerk at Cupples Station in St. Louis. The railroad tracks there were below the street level. The part of the station where plaintiff usually worked was at the street level. Below this part, at the track level, there was a large freight room. A tunnel (about a block long), connecting parts of the station at the track

level, opened into the southeast part of this room. There was an elevator in the east side of the freight room, about twenty feet north of the tunnel entrance, which was used to take freight to the street level. The north part of the tunnel was straight, but it curved about 250 feet south of the freight room entrance. The tunnel was about fifteen feet high. The tunnel floor was concrete covered with asphalt. According to defendant's superintendent, it was about eighteen feet wide. It had windows in the west wall near the ceiling and was also lighted by electric lights about every ten or twelve feet. On the day plaintiff was injured, there were six hand trucks, loaded with freight placed along the east wall of the tunnel at the north entrance. Three of these trucks were placed together and then a space of about two feet had been left between the third and fourth trucks, where there was a light switch in the wall. South of this space there were three more trucks end to end. These trucks were between three and four feet wide, five and a half feet long, and from sixteen to eighteen inches high. They were loaded with freight about three feet higher, which made a total height of about four and one-half feet. They had iron wheels about a foot in diameter and an iron handle or tongue. They weighed about 550 pounds, and the average weight of truck and load would be about 1500 pounds.

Plaintiff's duties were to check freight, delivered at the street level, to consignees. People would come to him with freight bills, obtained from the station office, and he would get the freight and deliver it to them, checking it to see that what the bills called for was delivered. The freight would usually be loaded on hand trucks at the track level so that it was necessary to bring the loaded truck up the elevator to the street level. Duplicate freight bills would be placed on the trucks covering the freight loaded thereon. Delivery to the street level could be obtained by giving a freight bill to an elevator operator, who would take it to a freight room employee, and he would locate the goods. He would then bring the trucks on which the goods were loaded to the elevator where plaintiff would deliver them to the consignee checking the articles delivered with the freight bills. Defendant's evidence was that this was the way it was directed to be done and that plaintiff was not authorized to go to the freight room and locate the freight himself. However, plaintiff's evidence was that, while this method had formerly been used, the station force had been cut down so that men were frequently not available to operate the elevator or to locate freight at the track level and load it on the elevator, but that he often had to do all of these things. He said that he had been operating the elevator, locating and loading freight frequently for more than a year preceding his injury.

On the day he was injured, plaintiff received a freight bill for a shipment of canned pineapple. He went down the elevator to

locate the shipment. He went to the trucks (above described) at the entrance of the tunnel and found that three of them were loaded with the goods he was seeking. He was standing in the space at the light switch between the third and fourth trucks examining one of the freight bills so that his head and shoulders were above the goods on the trucks (his height was 5 feet 8 inches) when he saw a tractor pulling four trucks coming around the curve in the tunnel south of him. The tractor was also pushing another truck in front of it, which one of defendant's employees was guiding by walking in front holding the tongue with his hands behind his back. The truck train was coming about as fast as a man could walk. While passing the trucks between which plaintiff was standing, the fourth (rear) truck pulled by the tractor collided with the sixth (southern-most) truck parked along the east wall so violently that it caused the fifth truck to strike the fourth truck, with such force that it was thrown against and crushed plaintiff's leg between it and the third truck before he could get out of the space in which he was standing. According to defendant's evidence, there were also trucks parked along the west wall so that the space in which the tractor operator had to move the truck train was very narrow. There was also evidence that the trucks would sway, that is, swing from side to side. Plaintiff said that he had seen them do that but that this only occurred at the south end of the tunnel near the curve where plaintiff said that the floor was in bad condition. He said that this did not occur at the north end because the north half of the floor was in good condition. He said that the floor in the south part of the tunnel near the curve was rough and that this caused the swaying of the trucks and that also failure to grease them would cause them to sway more. He said he had seen them sway about six inches. The tractor operator was attempting to make a turn into the freight room at the time the trucks collided. Both the employee who was guiding the truck pushed in front of the tractor and the tractor operator denied that they saw plaintiff standing between the trucks. The tractor operator was asked if he could have seen him and said: ''I could if I looked.''

Defendant relies upon the Federal Rule applicable to track workers and yard men, citing T., St. L. & W. Railroad Co. v. Allen, 276 U. S. 165, 48 Sup. Ct. 215, 72 L. Ed. 513, and Martin v. Wabash Railroad Co., 325 Mo. 1107, 30 S. W. (2d) 735, holding such employees must look out for their own safety and that there is no duty to discover them or to warn them until actually seen in peril. We do not consider that rule applicable to this case because this was not a case of a train on a track. It is a case (according to plaintiff's evidence) of trucks, which had plenty of space to run where they would be reasonably expected to run, running outside of their regular course and striking other trucks which appeared to be

1060

in a place of safety. The track rule might apply if plaintiff got into the path of the trucks but it certainly would not apply when he was in a place where they should not ever go. [See Aerkfetz v. Humphrey, 145 U. S. 418, 12 Sup. Ct. 835, 36 L. Ed. 758; Rocco v. Lehigh Valley Railroad Co., 288 U. S. 275, 53 Sup. Ct. 343, 77 L. Ed. 743; Halges v. Central Railroad Co. (C. C. A.), 58 Fed. (2d) 169, certiorari denied 287 U. S. 607, 53 Sup. Ct. 11, 77 L. Ed. 528.]

█ Defendant contends that it was guilty of no negligence in striking the trucks, apparently meaning no negligence under the humanitarian doctrine. It further argues that plaintiff assumed the risk and that his own negligence was the sole cause of his injuries. However, this is not a case which must depend upon the humanitarian doctrine as defendant seems to assume. Considering the facts most favorable to plaintiff, we think that it was obviously negligence (certainly the jury might so find) to operate the train of trucks, with plenty of clear space in which to move, so as to catch the rear truck against the southernmost loaded standing truck and propel it forward with such force as to cause the third truck north to move so violently that it broke plaintiff's leg. Certainly the use of ordinary care would prevent such a violent collision with stationary trucks under such circumstances, and failure to conform to the standard of ordinary care of a reasonable man under like circumstances is negligence. [American Law Institute Restatement of Torts, secs. 282-283.] Similar situations are cases where an automobile strikes a parked car or other object on the street and by thus setting it in motion injures another nearby. [Rockenstein v. Rogers, 326 Mo. 468, 31 S. W. (2d) 792; Schrader v. Burkel (Mo.), 260 S. W. 63; Davis v. Howell, 324 Mo. 1227, 27 S. W. (2d) 13; Stewart v. Jeffries, 224 Mo. App. 1050, 34 S. W. (2d) 560; see, also, Miller v. W. E. Callahan Const. Co. (Mo. App.), 46 S. W. (2d) 948.] This is held to be negligence where the parked car can be seen in time to avoid striking it. Here both parties tried the case on the theory that there was plenty of light in the tunnel. Not only is this automobile law, but it was also ''horse and buggy'' law. [Fleischman v. Polar Wave Ice & Fuel Co., 148 Mo. App. 117, 127 S. W. 660 (where a standing wagon was struck by another wagon).]

█ If defendant's tractor operator was negligent, then (except for assumption of risk) the only remaining question is whether such negligence was a proximate cause of plaintiff's injury. It is true that some of the above cited automobile cases were considered under the humanitarian rule, not, however, because the defendant could have seen the plaintiff therein (hidden from view because behind the car), but because the automobile was such a ''bulky object in the road'' that ''he might have seen it by moonlight if he had no lights.''

[Davis v. Howell, supra.] Why should this impose a duty to a person he did not see? The answer must be because it might reasonably have anticipated that persons might be near a parked car under the circumstances and be injured if it was caused to move suddenly and violently by colliding with it. Causal connection is usually a jury question, and if it can reasonably be anticipated that setting a certain force in motion would injure some one (that is, if injury would be a reasonable and probable consequence), it makes no difference that the manner in which it did injure someone might not have been foreseen or anticipated. [45 C. J. 918, sec. 484; 22 R. C. L. 125, sec. 12; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S. W. (2d) 122; Brackett v. Black Masonry & Contracting Co., 326 Mo. 387, 32 S. W. (2d) 288; Frese v. Wells (Mo.), 40 S. W. (2d) 652; Anderson v. Asphalt Distributing Co. (Mo.), 55 S. W. (2d) 688; General Box Co. v. Missouri Utilities Co., 331 Mo. 845, 66 S. W. (2d) 442; Christiansen v. St. Louis Public Service Co., 333 Mo. 408, 62 S. W. (2d) 828; Kimberling v. Wabash Railroad Co., 337 Mo. 702, 85 S. W. (2d) 736; Western & Atlantic Railroad Co. v. Hughes, 278 U. S. 496, 49 Sup. Ct. 231, 73 L. Ed. 473.] The American Law Institute states this rule to be that: "If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." [Restatement of Torts, sec. 435 (illustration 3, p. 1176 is a situation similar in principle to this case); see, also, Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270.]

In the automobile cases above cited, of course, the driver was under the duty to keep a lookout on public highways and was held to see what he could have reasonably discovered. Whether there was such a duty in this case is immaterial because the tractor driver actually did see the standing trucks. It was his duty to his employer to avoid coming into a violent collision with them, which might damage them or the goods on them. It was also his duty to other employees to avoid a violent collision with them if it might reasonably be anticipated that they would be working within range of a movement such as trucks would make if struck so violently as the evidence shows in this case. The chance of injuring someone in the parked automobile cases was not remote and speculative, and we think that is true in this case. Defendant argues that the presence of plaintiff between the trucks could not be anticipated. We think the evidence at least warrants the inference that the presence of some of defendant's employees somewhere near these trucks was a situation that could reasonably have been anticipated. These trucks were in the tunnel entrance, the nearest only about twenty feet from an elevator

entrance which employees were frequently using; they were at the edge of the large freight room where employees were coming and going at all times during working hours; they were only placed there temporarily to be moved whenever someone called for the freight loaded thereon; some employee (plaintiff's evidence showed that he also had such duties) would have to go near the trucks to examine the freight on them, check it with the freight bills, and then take them upstairs for delivery of freight; and, moreover, a space had purposely been left so that employees might go where the light switch was located. We, therefore, do not think it can reasonably be argued that there could only be liability for injuries resulting from a violent collision with a line of standing trucks if the tractor operator actually saw someone standing between or near them. It is enough that he saw the trucks, could by the exercise of ordinary care have avoided striking them so as to move them violently, and failed to do so, because the evidence showed a situation in which the jury would be warranted in finding that it might reasonably be anticipated that some employees of defendant in the proper discharge of their duties might be near enough to the trucks to be injured by such a collision. We hold that the evidence showed negligence on the part of defendant's tractor operator which the jury might reasonably find was the proximate cause of plaintiff's injury.

This holding disposes also of the contention that plaintiff's negligence in going and staying between the trucks was the sole cause of his injuries. As to assumption of risk, certainly, if his evidence as to the space the truck train had to move was true, plaintiff had no reason to expect such a collision. The mere fact that plaintiff had seen trucks sway or swing as much as six inches from a straight course, or the fact that he had previously seen a moving truck strike the side of a standing truck, would be no reason, under these circumstances, why he should anticipate a collision which would move two trucks against a third (average weight of 1500 pounds each) with such violence as to propel it across the space in which he stood so forcibly as to catch and crush his leg against a fourth truck. Certainly the jury could find that this was unusual and extraordinary risk, suddenly created by an act of negligence, which was not an assumed risk. [Halges v. Central Railroad Co. (C. C. A.), 58 Fed. (2d) 169; C., R. I. & P. Railroad Co. v. Ward, 252 U. S. 18, 40 Sup. Ct. 275, 64 L. Ed. 430; Reed v. Director General, 258 U. S. 92, 42 Sup. Ct. 191, 66 L. Ed. 480.] These issues were properly for the jury. We hold that the defendant's peremptory instruction was correctly refused.

Defendant also assigns as error the giving of plaintiff's Instruction No. 1 authorizing a verdict. This is attacked on the ground that it did not require a finding that defendant's operator actually

saw plaintiff between the trucks. Like defendant's contention on its peremptory instruction, this was based on the Federal rule that railroad yard and track employees must look out for trains, and that the company owes them no duty to keep a lookout. This contention is disposed of by our ruling on defendant's request for an instructed verdict. For the reasons above stated, since defendant's driver saw the trucks and if, as hypothesized in the instruction, "there was ample room . . . to have safely driven . . . so as to have avoided said collision," then it was negligence to strike them, and the jury could find that such negligence directly caused plaintiff's injuries.

Defendant also contends that the verdict is excessive and we think that this contention must be sustained. Plaintiff did not lose his leg although the break caused an unusual crushing of the bone. Nevertheless, the permanent impairment of the use of his leg was only forty per cent, according to the greatest estimate made by any doctor, and he can walk without a cane or crutch. The injury was a comminuted fracture of the right tibia below the knee. The fracture extended into the knee joint and left him with a permanently impaired knee. In addition to the multiple fracture of the bone, there was crushing which interfered with the blood supply. The doctors for several days thought that the leg might have to be amputated. After a period of two or three weeks of treatment with ice bags and other applications, they were able to place it in a splint. There was also inflammation of the popliteal nerve, which controls the muscles of the calf of the leg, and caused him to suffer and to continue to suffer pain. The ligaments and muscles also were torn. There was an enlargement of the right leg and knee, and the right leg is deformed by remaining bowed. Elevation on his shoe is necessary to relieve these effects. Plaintiff was in the hospital ninety-four days and then in bed at home for quite a while. After that he got around on crutches, and later used a cane for about eight months. After leaving the hospital, the doctor came to his home and treated him, and plaintiff also went to the hospital for treatments by light about three times a week. Plaintiff was able to give the leg light treatments at home himself, but later he went to his family physician for further treatments. At the time of trial plaintiff still had pain in his leg, and baking treatments were used to relieve it. If he used his leg much it swelled up; he would have cramps in it and lose sleep; and would have pains extending from his hip to his ankle. His leg would also get numb, and feel like a log, because of insufficient circulation.

Plaintiff was over sixty years of age at the time of his injury and was earning $110 per month. He had worked at the same job for thirty years. Formerly a maximum of $10,000 was adhered to in cases of complete loss of a leg below the knee, but more recently in

cases of exceptional circumstances somewhat larger amounts have been permitted to stand. [Evens v. Terminal Railroad Assn. of St. Louis (Mo.), 69 S. W. (2d) 929, and cases cited.] Plaintiff here has not completely lost his leg or its use and we hold that the greatest amount for which a verdict could be sustained, in this case, under all former precedents considering age, expectancy and earnings is $10,000. [Jenkins v. Missouri State Life Ins. Co., 334 Mo. 941, 69 S. W. (2d) 666, where authorities are reviewed; Harlan v. Wabash Railroad Co., 335 Mo. 414, 73 S. W. (2d) 749; Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S. W. (2d) 894; Pearson v. Kansas City (Mo.), 78 S. W. (2d) 81; Cole v. St. L.-S. F. Railroad Co., 332 Mo. 999, 61 S. W. (2d) 344; Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S. W. (2d) 865.]

If plaintiff will within ten days enter a *remittitur* of $5000 as of the date of judgment, the judgment of the trial court will be affirmed for $10,000; otherwise, the judgment will be reversed and the cause remanded. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.*, not voting because not a member of the court when cause was submitted.