ORVILLE HARTGROVE, Respondent (Plaintiff), v. CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, a Corporation, Appellant (Defendant).—No. 40818.—218 S. W. (2d) 557.

Division One, February 14, 1949.

Rehearing Denied, March 14, 1949.

*Sullivan, Finley & Lucas, Wilder Lucas* and *Ralph T. Finley* for appellant.

974

*Frank Mattes* and *Chelsea O. Inman* for respondent.

[558] VAN OSDOL, C.—Appeal from a judgment upon verdict (nine jurors agreeing) for $10,000 in plaintiff's action under the Federal Employers' Liability Act, 45 U. S. C. A., § 51 et seq. The injuries were alleged to have been sustained by plaintiff when he was working as a member of a work-train crew picking up loose rails and scrap along defendant's east-west track between Clarence and Monroe City.

Errors are assigned in submitting plaintiff's case to the jury, and in the instructions given; and in the trial judge's action in conferring with the foreman of the jury in chambers and in the absence of counsel for the parties.

The plaintiff was injured about four o'clock the afternoon of February 2, 1945. Defendant's employees were then operating the work train in picking up rails just west of Monroe City. The earth was frozen and there was some snow on the uneven ground at the scene of plaintiff's injury.

In respective order from west to east, the work train consisted of a way car or caboose, an engine and tender, two gondola or coal cars, a flatcar equipped for hoisting and loading rails from the roadbed into the gondola cars, and two more gondola cars. Loading equipment, mounted on the flatcar, consisted of two derrick cranes with booms or beams which could be moved laterally. (We are here concerned with the operation of the derrick crane mounted on the west end of the flatcar, which crane was then being used in loading rails from the north side of the track and into the gondola car immediately west of the flatcar.)

A cable ran from a drum (mounted on the upright mast of the derrick crane) out over and parallel with the boom and through [559] a pulley at the end of the boom. A grappling hook was attached to the end of the cable. The cable and hook were used as a tackle to engage the center of a loose rail and in holding and bearing the rail up, over and into the gondola car. The hoisting and lowering movements were accomplished by means of compressed air. The employee who engaged the grappling hook is called a "hooker." Two other men steadied the rail as it was hoisted; they are called "tailers." Three men, "placers," were on duty in the gondola car—these men "would get the rail when it got to the top of the car and lay them."

Rope "pullers," ordinarily two on each side of the gondola car, manned ropes attached to the pulley end of the boom. The pullers on one side of the car caused the crane to move laterally out above the "shoulder" of the roadbed and, when the grappling hook was hooked to a loose rail and the rail was hoisted so as to clear the top of the gondola car, the pullers on the opposite side of the car pulled the rail-bearing boom laterally over the gondola car so that the rail could be lowered and nicely placed in the car. Plaintiff was a puller on the south side of the gondola car. When "they got the rail up to the top of the car," it was plaintiff's duty to "pull it on the car. . . . When it got up there they hollered 'Pull' and we pulled it on the car." The foreman was "on the car where the boom was." As a general rule the rope pullers were directed by the foreman to "slack or tight. That meant to loosen or tighten . . . . He would . . . holler 'Pull.' "

Safety chains were fastened to the end of the flatcar and angled along and were attached to each side of the boom. The chains were attached to the boom at points near one fourth of the extent of the boom. These safety chains were adjustable, their adjusted length governing the distance the boom could be moved laterally. The men, placers, working in the "rail car" ordinarily made the adjustments.

Most of the rails being loaded were "on the shoulder" along the roadbed near the ends of the ties, but occasionally one, a "wide rail . . . maybe one or two a day. You never could tell. You find one once in awhile," was to be found some distance over the embankment.

At the time plaintiff was injured, the crew was in the process of loading a "wide rail" from the north side of the track. Plaintiff was standing south of the gondola car holding the rope to keep it out of the snow. Plaintiff testified he was facing eastward in his usual position so as to get his instructions from the foreman as he customarily did; "as a general rule he (the foreman) would say 'Pull' or 'Slack.' At that time he didn't say anything. I was standing holding the rope waiting for an order, which wasn't called. . . . When they hooked onto the rail and put the power on it jerked and throwed me. . . . I lit on my back. It threw me over a pile of dirt there that hadn't been dressed down." Plaintiff testified he was holding the rope "tight (but not like a wild mule) because I figured they were loading at that time on the other side. I was ready to pull if he hollered 'Pull.' "

There was testimony tending to show the safety chains must be let out in order to reach and hoist a rail which "is lying down past the edge of the shoulder . . . you got to let that south chain out if the rail is over the (north) dump." If the south chain were unhooked or let out and if the pulley end of the boom were not directly over the wide rail, the weight of the rail (when hoisted) would cause the boom to "jerk" to the northward; but it could not move suddenly or "jerk" northwardly unless it was unhooked or let out. And there was testimony tending to show that, if the chain were not unhooked or lengthened, the tackle would drag a "wide rail," endangering the hooker and tailers on duty north of the car. At the time plaintiff was injured the grappling hook was engaged with a wide rail, although the pulley end of the boom was not out directly over the rail. When the hoisting apparatus was used, the boom suddenly swung "three to five feet" to the northward "jerking" plaintiff and causing him to be thrown upon the uneven frozen ground.

Plaintiff's case was submitted to the jury upon hypothesized facts supporting the theories of defendant's negligence, (1) in failing to have the boom of the crane directly [560] over the rail to be hoisted from the north side of the track and when, although unknown to plaintiff, the safety chain had been released or lengthened so as to

permit the boom (when the hoisting power was applied) to swing northwardly from its then position; and (2) in violating a uniform custom and practice of defendant before applying the power, in such circumstances, to warn the rope pullers to give slack. Only the issue of specific negligence (1) was submitted in plaintiff's Instruction No. 1; and plaintiff's Instruction No. 2 also hypothesized facts supporting specific negligence (1) and (2), but submitted the issue of specific negligence (2) in violating the alleged custom. There is no contention the two instructions were defective in form, but each of the instructions directed a verdict for plaintiff upon a finding of the facts hypothesized. It is, therefore, necessary to determine if there was substantial evidence supporting the submission of both of the submitted issues of negligence. Hutchison v. Thompson, Mo. Sup., 175 S. W. 2d 903.

Defendant-appellant contends there was no evidence the safety chains had been loosened or lengthened, and no evidence of a custom or practice to warn the rope pullers to slacken (or pull).

Furthermore, defendant-appellant contends that the alleged custom or practice was not for the benefit of the plaintiff, but for the benefit of defendant's employees, hooker and tailers, who were handling the rail on the north side of the track; that plaintiff's fall and injury could not have been reasonably anticipated as a result of the alleged negligence; and that no substantial evidence supported the conclusion the alleged negligence proximately caused plaintiff's injury.

Defendant-appellant correctly urges the Federal Employers' Liability Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of the employer's liability is his negligence, not the fact that injuries occur. And the employer's negligence must be "in whole or in part" the cause of the injury. 45 U. S. C. A., § 51; Wilkerson v. McCarthy, 1949, 69 S. Ct. 413; Ellis v. Union Pacific R. Co., 329 U. S. 649, 67 S. Ct. 598; Brady v. Southern Ry. Co., 320 U. S. 476, 64 S. Ct. 232. The employee-plaintiff is required to present probative facts from which the negligence and the causal relation can be reasonably inferred; ". . . the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Galloway v. United States, 319 U. S. 372, 63 S. Ct. 1077; Myers v. Reading Co., 331 U. S. 477, 67 S. Ct. 1334. "Only when there is a complete absence of probative facts to support the conclusion reached" by a jury is an appellate court justified in overturning the jury's verdict. Lavender v. Kurn, 327 U. S. 645, 66 S. Ct. 740; Myers v. Reading Co., supra.

It is true defendant's witnesses testified the safety chains had not been released or loosened and that no sudden swinging of the

boom to the northward occurred. This evidence, no doubt, was weighed by the jury. It is also true plaintiff testified that he, being down by the south side of the gondola car, was not in a position to see whether the chain was or was not loosened. But, as we have stated, there was evidence tending to show the facts that the boom, when the hoisting power was applied, did swing suddenly to the northward; and that the "jerk" of the boom could not have happened except the boom had been released or loosened. Such facts were substantial bases for the reasonable inference the safety chains had been so lengthened or loosened as to permit the sudden movement of the boom, notwithstanding the positive testimony to the contrary. Martin v. St. Louis-San Francisco R. Co., 329 Mo. 729, 46 S. W. 2d 149. In the case of Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, cited by defendant, there was no shown basis of probative fact for an inference the two strings of cars were brought into violent contact as alleged by plaintiff. Plaintiff's witness, Bainbridge, could only state he heard a loud crash. A crash was not unusual in the busy switching yard—"it happened [561] every day." The witness was not in a position to see whether or not the strings of cars collided. As a "fact" basis for an inference the cars did collide as alleged by plaintiff, Bainbridge's testimony of the "crash" was insubstantial.

We think it unnecessary to here restate the substantial evidence we have hereinbefore stated tending to show the hoisting and loading of rails was directed by a foreman who customarily gave orders to "slack" and "pull." Evidence tended to show it was the plaintiff's duty to heed the orders and to be in readiness to aid the process of loading. It was to be expected defendant's employees, including plaintiff, engaged in the loading operation, conscious of the practice, would regulate their conduct in anticipation of the customary orders. Indeed, the practice does not seem to have been so much for the purpose of safety as for the purpose of facilitating the loading operation. The failure to give the order or warning to slacken, isolated from the circumstances obtaining, might not be considered a violation of a duty to plaintiff. But we bear in mind the evidence tending to show the facts that, when the hoisting power was applied, the pulley end of the boom was not over the "wide rail" and the south chain had been loosened or unhooked, and no order given; and hypotheses of such facts were included in plaintiff's Instruction No. 2. Considering the evidence from a standpoint most favorable to plaintiff, the evidence justified a finding the boom jerked because the operation of lifting the wide rail was made when the chains and boom were loosened in such a way that the boom could be suddenly moved laterally when the hoisting power was applied. It seems reasonable to say that it should have been foreseen such an operation in such a way was likely to injure some employee engaged in the operation of

loading the rails. The jury was warranted in finding that the jerking of the boom caused plaintiff to fall; and that by giving a warning of the movement, such as a call for "slack," although the boom was not over the rail and the chains were not properly adjusted, defendant could have avoided the casualty. Although it might be urged the defendant could not have foreseen the manner in which the defendant's conduct might injure, yet, if the injury to someone would be a reasonable and probable consequence of defendant's conduct, it makes no difference that the manner in which it did injure someone might not have been foreseen or anticipated. Mrazek v. Terminal R. Ass'n. of St. Louis, 341 Mo. 1054, 111 S. W. 2d 26; Vol. II, Restatement of the Law of Torts, § 435, pp. 1173-1177; see also Floyd v. Thompson, 356 Mo. 250, 201 S. W. 2d 390, and cases therein cited.

We hold the evidence justified the conclusions that defendant was negligent as submitted in plaintiff's Instructions Nos. 1 and 2, and that its negligence ("in whole or in part") proximately caused plaintiff's injuries. This ruling also disposes of a contention of defendant that, as a matter of law, alleged negligence of plaintiff was the sole cause of his injury.

After the issues of the case had been submitted to the jury and after the jury had deliberated for some time, the jury were conducted into the courtroom by the deputy sheriff. The trial judge, without convening the court, requested the deputy sheriff who was in charge of the jury to conduct the foreman to the judge's chambers. The foreman remained in the judge's chambers for "a few minutes." After a conference with the judge, the foreman returned to the courtroom and the jury were conducted back to the jury room. One of defendant's counsel was in the courtroom at the time. Soon thereafter, a noonday recess was declared. When court reconvened after the recess, counsel for defendant was informed "the jury was supposed to have told the deputy sheriff . . . they desired additional instructions," but neither counsel for plaintiff nor for defendant interposed any objection; and an hour and a half after the noonday recess the jury returned a verdict for plaintiff as stated.

There is contained in the record a memorandum, prepared and filed by the trial judge when the motion for a new trial was overruled, in which memorandum the trial judge made a statement relating to his conversation with the foreman of the jury. We now set out, in part, the trial judge's memorandum,

[562] "The main point the defendant seems to stress is the interview of the Court, in chambers, with the foreman of the jury, after the deliberations had started. . . .

"The intention in this instance was to ascertain from the jury what the difficulty was, and if additional instructions were needed to take formal action in court.

"The interview with the juror was not intended to be a private one, nor was there any intention that the counsel would be excluded if they desired to be present. Counsel frequently leave the courtroom after submission of the case to the jury, and have to be re-assembled if any important action is to be taken with respect to the deliberations of the jury.

"In the instant situation the question disturbing the jury was a very simple one, and of little importance as bearing upon the merits of the case. It apparently grew out of a misconception on the part of the jury of a statement made by the plaintiff's counsel to the jury in his argument. The foreman related to the Court that the attorney for the plaintiff had stated in the course of his argument that the amount sued for was $55,000, and that was what the plaintiff was claiming, and the question was whether the jury could compromise the amount. The foreman was asked what he meant by 'compromise,' and he replied that the jury wished to know whether they could give less than the amount sued for, if the finding was for the plaintiff, or whether they had to give the full amount sued for or nothing.

"It was apparent that the word 'compromise' was ill applied, and what the jury really wanted to know was whether they had the power under the circumstances to award less than the amount sued for. It was quite obvious to the Court that the inquiry of the juror bore no relation to any real merits of the case. There was nothing said, nor were there any implications arising out of anything said or done, that there was any desire on the part of the jury to render a compromise verdict.

"It was clear to the Court that the confusion in the minds of the jury could be easily cleared up by a simple reference to the instructions given in the case. So the Court told the juror that he should read the instructions already given in the case and the forms of verdict. The damage instruction contained a complete answer to his inquiry . . . ."

In an early state case (State v. Alexander, 66 Mo. 148, at page 164) this court approvingly quoted the expressed view of the Supreme Judicial Court of Massachusetts, "We are all of opinion, after considering the question maturely, that no communication whatever ought to take place between the judge and the jury, after the cause has been committed to them by the charge of the judge, unless in open court, and, where practicable, in presence of the counsel in the cause." Sargent v. Roberts, 18 Mass. (1 Pick.) 337, at page 341. See also Chouteau v. Jupiter Iron Works, 94 Mo. 388, 7 S. W. 467; Chinn v. Davis, 21 Mo. App. 363. Such a communication is improper, but such impropriety does not require a reversal if it is determined the error, in the circumstances, could not have been prejudicial. This is, no doubt, because it is provided that this court, or the courts of appeals, shall not reverse the judgment of any court "unless it shall

believe that error was committed by such court against the appellant, and materially affected the merits of the action." Civil Code of Missouri, Section 123, Laws of Missouri 1943, p. 390, Mo. R. S. A. § 847.123; Sullivan v. Union Electric Light & Power Co., 331 Mo. 1065, 56 S. W. 2d 97; Glenn v. Hunt, 120 Mo. 330, 25 S. W. 181; White v. Hasburgh, Mo. App., 124 S. W. 2d 560. In the Sullivan case it was apparent that no prejudice could have resulted; the written instruction was prepared in open court and given in the presence of counsel for both sides although it was sent (not read) to the jury, and the instruction was not in reference to a controverted fact. In the Glenn case the instruction sent to the jury room was not in reference to any controverted issue; there could have been no prejudice to defendant in the instruction given. And in the White case the reviewing court was of the opinion the instruction "could be said to go, merely, to the form of the verdict."

While, in the instant case, there is no doubt the trial judge, a most able jurist with the finest sense of responsibility, was prompted by no improper motive, yet it was improper for him to discuss the case with [563] the foreman of the jury in chambers—not in open court—in the absence of counsel for the parties and in the absence of the other jurors. It is true counsel for defendant did not interpose an objection, although one of defendant's counsel was in the court when the foreman was conducted to and withdrew from the judge's chambers and although, an hour and a half before the verdict was returned, counsel for both parties were advised by someone that the jury was "supposed" to have desired further instructions. Counsel did not then know what conversation took place between the judge and the foreman. Counsel did not question the judge relating to the interview. Counsel did not know that, even though the jury "desired additional instructions," the trial judge in chambers would or did verbally instruct or discuss the case with the foreman in the absence of the other jurors and in the absence of counsel. Counsel did not waive that which they did not know. Our Civil Code contemplates a party be afforded an opportunity "at the time" to make known to the court the action which he desires the court to make, and the party's failure to object at the time does not prejudice him if he is afforded no opportunity to object. Section 122, Civil Code of Missouri, Laws of Missouri, 1943, p. 389, Mo. R. S. A. § 847.122, amended Vol. I, Laws of Missouri, 1947, p. 228.

How simple it would have been for the trial judge to have assumed the bench and, the twelve jurors being in the jury box and counsel for the parties having been caused to be present, to have asked the foreman to state his question there and then in open court. Counsel would have there and then had the opportunity to know and to cause to be recorded, if they wished, the exact language of the foreman's question; and to advise the court what action counsel believed should be

taken; or to object to that which counsel might have thought was improper action.

The trial judge, in the memorandum, supra, stated the foreman's question was of little importance as bearing on the merits of the case. But the memorandum discloses the trial judge did discuss the case with the foreman in chambers and in the absence of the other jurors and of counsel. The "merits of the case," of course, included the issues of liability and the amount of the award, and it could not be said that the amount of an award might not be "compromised" or lowered in order to induce the concurrence of one or more jurors in a "finding . . . for the plaintiff" upon the issue of liability. And how did the trial judge know and how can we know, assuming the trial judge was correct in his conclusions stated, that the foreman correctly quoted to his fellows what the trial judge had said.

We are unable to determine the impropriety of the trial judge's action was not prejudicial.

The judgment should be reversed, and the cause remanded. It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.