259 S.W.2d 391 (1953)
KILLINGER
v.
KANSAS CITY PUBLIC SERVICE CO.
No. 43026.
Supreme Court of Missouri, Division No. 1.
June 8, 1953.
Motion for Rehearing or to Transfer to Denied July 13, 1953.
Opinion Modified on Motion July 13, 1953.
*392 Charles L. Carr, Kansas City, E. E. Thompson, Sam Mandell, Kansas City, Popham, Thompson, Popham, Mandell & Trusty, Kansas City, of counsel, for appellant.
Clarence C. Chilcott, Kansas City, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied July 13, 1953.
Opinion Modified on Court's Own Motion July 13, 1953.
LOZIER, Commissioner.
Action for damages for personal injuries. Plaintiff-respondent had a verdict and judgment for $18,000. Upon this appeal, defendant-appellant assigns error in the giving of plaintiff's requested Instructions Nos. 1, 2, 3, 5 and 6.
On September 13, 1947, plaintiff sustained injuries while a passenger on one of defendant's southbound Troost Avenue streetcars. Between 41st and 42nd Streets, Troost is 65 feet wide, curb to curb, and defendant's right of way in the center is 18.3 feet. The outer limits of the right of way varies from 1.3 feet to 1.8 feet from the outer rails.
Plaintiff and her daughter boarded the streetcar at 39th and Troost. The car was crowded. Plaintiff was standing in the aisle between the front and center doors. She faced west and, with her right hand, grasped firmly a stanchion (a vertical rod or pole for standing passengers to hold to). The car started. "It seemed the motorman was driving awfully fast, at a high rate of speed. * * * All of a suddena sudden jerk, and it threw me around." She lost her grip, was thrown backwards and to the floor. About the time she fell, she screamed. Plaintiff had often ridden the streetcars and had observed their "usual jerks and lurches * * *; this was unusual." She "had never experienced a shock like that." The "jerk" was a "sudden stop or whatever you call it; * * * it was just a sudden jerk * * * just a sudden, violent stop." She was on the floor before any stop was made. Before the jerk, the car "just kept kind of moving along" and then *393 came to a sudden stop. There was no slackening or diminution of its speed prior to the time she fell. As she was standing in the aisle, she had a view to the front and to the west and no automobile or truck passed the streetcar on that (the streetcar's right) side.
Plaintiff's daughter stood in the aisle back of the center door, facing east. She placed her mother's position as her mother had described it. She observed her mother after the car started moving. "The streetcar was moving pretty fast * * * and all of a sudden I heard someone scream. * * Then I heard a thud on the floor * * *. Q. Well, what happened to the streetcar? A. Well, when he heard that thud he brought the streetcar to a halt. * * *" She heard her mother scream before the streetcar stopped. "After the thud on the floor, it came to a halt." The streetcar made a "quick stop."
Spencer, a passenger, noticed nothing special about the car's speed. He was looking toward the west "and there was a shock to the car * * * as if there had been an impact or sudden stop." He did not notice an excess of speed or "anything above normal." He "looked around to see what had caused the impact and there was a car ahead of the streetcar but" there was no "impact" between the streetcar and the automobile. "As I looked up to see, he had practically straightened out parallel to the track. * * *" Spencer "thought" that the automobile had "pulled out of parking or had been in the process of passing the streetcar. There had been some movement, I didn't see, it didn't register." He did not think the wheels of the motorcar were on the tracks. The automobile, still moving, was "not over 20 feet" from the streetcar when the streetcar came to a stop. However, he could not say positively whether he had seen the automobile prior to the time the streetcar stopped. A complete setting of the brakes was the way to stop the streetcar"that would mean absolutely that there was some cause for an emergency stop; * * * an emergency stop isn't normal." However, he did not recall ever having been on a streetcar before when "an emergency stop was made to keep from hitting something on the track."
Mrs. Seibert was sitting "exactly behind the motorman." She heard plaintiff scream. "At the time the lady fell he slammed the brakes on, I wouldn't know for any particular reason. Q. How do you know he slammed the brakes on? A. Well, I was sitting behind him and we were in the middle of the block and the [streetcar] stopped abruptly." On cross-examination, she was asked: "Q. Did I understand you to say you saw him apply the brakes or felt the application? A. Well, perhaps I said it wrong. I felt it in the middle of the block." She was not paying any attention to "the outside of the car, the track or the street and didn't see the automobile." She couldn't recall whether the streetcar stop began before or after the scream.
Olsen, standing in the aisle and facing west, saw an automobile pull out close to the car. "It seemed like he was parking and that is why the operator had to stop his car. I imagine the operator was afraid he was going to hit the car. * * * He was headed toward the track and the driver [streetcar operator?] probably didn't know where he was going. * * * Q. And you noticed when this car started out suddenly the operator applied his brakes? A. Yes, I did. Q. And brought the car to a stop? Yes, there was a stop. * * * A. It seemed like an abrupt stop." He did not notice or know what happened to the automobile. The automobile driver gave no signal. "I just saw the automobile."
Mrs. Closser, seated next to the aisle on the first seat on the west side, "was dreaming, I suppose, gazing out and saw a car and the [street] car stopped suddenly, it stopped not suddenly enough to throw me out of the seat, but it was sudden." She "wasn't paying any attention." She didn't know whether the automobile was going about the same speed or faster than the streetcar. The stop "was a sudden stop, not like a stop coming to a corner, it was an emergency stop." On cross-examination, Mrs. Closser had the "impression" that *394 the automobile was going to run into the streetcar. She didn't know where the automobile came from, "I just remember it as a blur at the side as I sat. I wasn't paying a lot of attention. * * * Q. At that time you saw it headed at a point in front of the streetcar and that is when the operator applied the brakes? A. Yes." Upon re-direct examination, she stated that she did not know "how long the car ran along beside this streetcar, or whether it was running parallel with the streetcar or whether the automobile was out of her sight when the streetcar stopped." She did not see the motorman apply the brakes and "the only thing she knew is that the streetcar stopped with a jerk."
Plaintiff introduced the deposition of Roberts, the motorman. He described the breaking equipment as consisting of a series of brakesthe dynamic (operating upon the motor), the shaft (operating upon the shafts) and the track (a magnetic brake operating upon the brake shoes). All three are operated successively by pressure on the foot pedal. For a regular service stop, the pedal is pushed "just down lightly," applying only the dynamic brake; "the other two brakes are not brought into the operation." Additional pressure, applying the dynamic and shaft brakes, is used for "just sort of a semi-emergency stop." The pedal is pushed all the way down (applying also the track brake) for an emergency stop. Plaintiff also introduced the deposition of Janes, defendant's division superintendent, who corroborated Roberts as to the brake system and its operation.
Roberts said that he made a regular stop at 41st Street. After he started up and had moved about 150 feet, he "heard a commotion," looked back and saw plaintiff on the floor. He stopped the car "after he heard the commotion." He was then moving about 10 or 12 miles per hour and made a "regular service stop." He heard somebody yell and thereafter brought the car to a stop in 50, 75 or 100 feet. However, he also said that he had not slackened his speed prior to the final stop. "Q. Was there anything on the track in front of you? A. No. * * * Q. Wasn't any obstacle on the track or nobody interfered with the operation of the car? A. No."
Defendant's evidence was that streetcars of the type involved were regularly inspected "on a light basis" every 6000 miles and "on a heavy basis" every 12,000 miles; that this streetcar had received regular inspections, including a "heavy" inspection on August 6, 1947; that one of its stanchions was repaired on August 27, 1947; and that it was inspected on September 23, 1947, ten days after plaintiff was injured. Defendant's inspection records showed no reports of defects of or repairs to the brakes. The "sign-off sheets" showed that, on the day plaintiff was injured, the motorman who signed off at 5:22 p.m., reported the streetcar in good condition, and that Roberts (the motorman when plaintiff was injured) and Conley (successor motorman to Roberts) both reported the streetcar "O.K." except that Conley had reported the front destination sign in bad order.
The first paragraph of plaintiff's Instruction No. 1 was: "The court instructs the jury that it was the duty of the defendant in operating the streetcar referred to in evidence to exercise the highest degree of care that very careful and prudent persons would use or exercise under the same or similar circumstances as those referred to in evidence for the safety of the passengers on said streetcar at the time and place referred to in evidence, and to exercise the highest degree of care to operate and move the same in such manner as not to throw them to the floor, and that any failure to observe and perform this duty would be negligence; and".
Defendant contends that the paragraph is in the abstract, and incorrectly "instructs the jury that defendant was under an absolute duty to carry its passengers as not to throw them to the floor and that any failure to observe and perform that duty was negligence"citing Venditti v. St. Louis Public Service Co., 360 Mo. 42, 226 S.W.2d 599, 602[5, 6]. However, the paragraph ending in "and" is followed by a paragraph of factual hypotheses submitting defendant's res ipsa negligence. See State ex rel. Grisham v. Allen, 344 Mo. 66, *395 124 S.W.2d 1080, 1082[3, 4]. "The facts required to be found to establish liability and the measure of defendant's duty are correctly set forth in that part of the instruction which purports to tell the jury what they must find in order to return a verdict for plaintiff. The first paragraph is thus explained and qualified, and the error therein, if it is error, rendered harmless." Drake v. Kansas City Public Service Co., 333 Mo. 520, 63 S.W.2d 75, 83[11].
Defendant next says that "plaintiff was bound by the testimony of her witnesses showing that the streetcar made an emergency stop because of the automobile." While several of plaintiff's witnesses testified as to the presence of the automobile, the motorman (also plaintiff's witness) categorically denied that "there was anything on the track in front of" him, that there was "any obstacle on the track" and that "anybody interfered with the operation of the car." However: "It has been held a plaintiff is not bound by the testimony of his own witnesses in so far as such testimony is contradicted by a plaintiff's other evidence. A jury may believe all of the testimony of any witness or none of it, or may accept it in part and reject it in part; just as a jury finds it to be true or false when considered in relation to the other testimony and the facts and circumstances in a case." Burr v. Singh, 362 Mo. 692, 243 S.W.2d 295, 298[4, 5].
Plaintiff herself definitely said that, as she stood in the aisle, she had a view to the front and to the west and that no automobile or truck passed the streetcar. As the testimony of plaintiff's passenger witnesses was contradicted by that of both plaintiff herself and her motorman witness, she was not bound by the testimony of her other witnesses. Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, 678. Compare Harrell v. Berberich, 359 Mo. 551, 222 S.W.2d 733, 735[1, 2].
Defendant next says that Instruction No. 1 should have required a finding that there was no "emergency" and "erroneously omitted any reference to the emergency stop testified to by plaintiff's witnesses." However, there was no "emergency" issue in this case. Defendant neither offered evidence nor asked instructions as to "emergency." Defendant did not submit "emergency" as a defense and joined in plaintiff's submission of her pleaded and evidenced res ipsa case. Since plaintiff's evidence entitled her to go to the jury upon the res ipsa theory, she could, in her instructions, ignore such parts of her evidence (other than her own testimony) as conflicted with her evidence supporting that theory. We hold that plaintiff was not required to negative the existence of an "emergency."
Defendant does not criticize plaintiff's Instruction No. 2, the language of which is almost identical with the plaintiff's Instruction No. 2 in Boulos v. Kansas City Public Service No., 359 Mo. 763, 223 S.W.2d 446, 448. However, defendant contends that the court erred in giving Instruction No. 2, "a res ipsa submission, since plaintiff submitted defendant's specific negligence in her Instruction No. 1" in this language: "* * * that the defendant by and through its agent and servant, in charge of and operating said streetcar at said time and place, if so, caused the speed of the same to slacken and said streetcar to stop with a sudden, violent, extraordinary and unusual jerk, jolt and lurch * * *." (Our italics.)
We do not agree that the italicized language submitted that the unusual jolt "was caused by the manner in which the motorman slackened the speed of the streetcar and brought it to a stop." Rather, it submitted only that the jolt resulted from the motorman's operation of the streetcar. See McCaffery v. St. Louis Public Service Co., 363 Mo. ___, 252 S.W.2d 361, 364-365[1]; Williams v. St. Louis Public Service Co., 363 Mo. ___, 253 S.W.2d 97, 101[5, 6].
In Boulos v. Kansas City Public Service Co., supra, we held that substantially similar language ("* * * that the defendant by and through its agent and servant in charge of and operating said bus at said time and place caused the same to lurch and jerk violently and suddenly and in an unusual and violent manner", 223 S.W.2d loc. cit. 448) did not submit specific negligence. We so rule as to instant *396 Instruction No. 1. It follows that the trial court did not err in giving Instruction No. 2.
Plaintiff's Instruction No. 3 was: "The court instructs the jury that the defendant, Kansas City Public Service Company, is a corporation, and that a corporation can only act by and through its agents, servants and employees, and that, therefore, any act on the part of one of its agents, servants and employees, within the scope of their employment, and within the limits of his authority, would be the act of the corporation, and that the corporation would thereby be responsible and liable therefor." Defendant says that the instruction is erroneous in that it "required the jury to return a verdict for plaintiff because of any act of the motorman"; that, as a carrier of passengers for hire, defendant is not an insurer and is liable for only negligence. Defendant also contends that the instruction, "being in the abstract, was confusing and misleading to a jury of laymen and constituted a roving commission not limited to the fact issues relevant to the case."
However, the jury could not have been misled, and defendant could not have been prejudiced, by Instruction No. 3. First, the instruction did not predicate a verdict. See King v. Rieth, 341 Mo. 467, 108 S.W.2d 1, Gillioz v. State Highway Commission, 348 Mo. 211, 153 S.W.2d 18, and Christman v. Reicholdt, Mo.App., 150 S.W.2d 527, 532 (all cited by defendant).
Again, instructions must be read and construed together. West v. St. Louis Public Service Co., 361 Mo. 740, 236 S.W. 2d 308, 313[10, 11]. Even where a verdictdirecting instruction is "merely indefinite, ambiguous, or misleading, standing alone, and these defects are corrected by other instructions so that when all are read together the law of the case is sufficiently stated, then the error in the one instruction is not reversible." State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351, 355[1, 2]. "While instructions containing mere abstract statements of law should not be given, the giving of such an instruction is not reversible error on appeal, unless it appears from the circumstances of the case that the instruction was confusing, misleading and prejudicial in the particular case." Benham v. McCoy, Mo.Sup., 213 S.W.2d 914, 920[13, 14]. In that case, we said of a non-verdict-directing instruction which "told the jury that, if they found the facts therein submitted and found that plaintiff was an independent contractor, defendant owed no duty to plaintiff as to his care and safety, such statement when read with the other instructions would have been understood to mean, no duty as submitted in the other instructions." 213 S.W.2d loc. cit. 920[13, 14].
Here, plaintiff's other instructions made it very clear that defendant's liability was based on negligence. As stated, Instruction No. 1 told the jury that it was defendant's duty to exercise the highest degree of care "that very careful and prudent persons would use or exercise under the same or similar circumstances as those referred to in evidence for the safety of the passengers on said streetcar at the time and place referred to in evidence, and to exercise the highest degree of care to operate and move the same in such manner as not to throw them to the floor, and that any failure to observe and perform this duty would be negligence"; and this was followed by factual hypotheses and a requirement for a finding that the "sudden, violent and unusual slackening of the speed and stopping of said streetcar, if you so find, was negligent, under all the facts and circumstances referred to in evidence," etc. Instruction No. 2 required the jury to find the hypothesized facts were "sufficient circumstantial evidence upon which the jury may infer that the defendant was negligent * * * unless" the jerk or jolt "was not due to the negligence of the defendant." Instruction No. 4 (burden of proof) was that if the jury believed that the "occurrence took place, as set out in Instruction No. 1, and that it would not have happened without some negligence on the part of the defendant, if any, and if you further find that such negligence, if any," caused plaintiff, etc. Instruction No. 5 defined the "highest degree of care" and told the jury that "negligent," "negligence" and "negligently" meant the failure to exercise the highest degree of care.
*397 Too, defendant's own instructionssome verdict-directingmade clear that defendant was not an insurer and was liable only for negligence. In Instruction No. 7, the jury was told that its duty was to decide, "first whether or not, under all the circumstances in evidence, there was or was not negligence upon the part of defendant, as submitted in other instructions herein." Instruction No. 8 expressly told the jury that "defendant was not an insurer of the safety of plaintiff and the fact that plaintiff fell while riding, as a passenger on defendant's streetcar and was injured, in and of itself, does not establish liability on the part of defendant." Instruction No. 9 was that it "should not find the defendant negligent from the mere fact of the occurrence shown by plaintiff's evidence," and that if the jury found and believed "from all the evidence in the case that defendant was not negligent" and that plaintiff had not sustained her burden of proof, she was not entitled to recover and that the verdict should be for defendant. In Instruction No. 10, the jury was told that negligence is not presumed but must be established by proof. We hold that, under such circumstances, any error in Instruction No. 3 was not reversibly erroneous.
Without citation of authority, defendant next says that "the combined and cumulative effect of plaintiff's Instructions Nos. 1, 2 and 3 was to make defendant an insurer of plaintiff's safety." It is apparent, from what we have hereinbefore said, that there is no merit in this assignment.
Instruction No. 5 told the jury that "by the term the `highest degree of care' as used in the instructions herein and as applied to defendant is meant such care as would be exercised by a very careful and prudent person under the same or similar circumstances as those referred to in evidence herein," and that "by the term `ordinary care' as used in the instructions in this case and as applied to the plaintiff is meant such care as would usually and ordinarily be exercised by an ordinarily careful and prudent person under the same or similar circumstances as those referred to in evidence." (Our italics.) Again without citation of authority, defendant says that the omission of the italicized words from the definition of the "highest degree of care" required of defendant unduly emphasized defendant's duty, and, considered with the other instructions, "created liability on the defendant because of any act of the motorman." We find no merit in this assignment.
In her petition plaintiff alleged that she "has lost and in the future will lose her earnings and that her earning capacity has been permanently impaired." For about seven years before she was injured, plaintiff and her daughter had lived together. Both were employed and earning their own living. Plaintiff was, and for about a year had been, employed as a housekeeper for a family consisting of the husband, his invalid wife, a son and daughter-in-law and an unmarried son (and later, the latter's bride). Plaintiff also acted as a nurse for the invalid wife. She received weekly $25 and meals of the estimated value of $5.
Plaintiff has not worked since she was injured. Before, she had been in excellent health and was physically quick and active for a woman of her age (66). Defendant offered no medical evidence and defendant's attorney, in his argument to the jury, conceded that plaintiff had been "seriously injured." Plaintiff's medical testimony, briefly, was that there was a progressive cystic degeneration of the head of the left femur; the left leg is two inches shorter than the right; there is an atrophy of the muscles of the left calf and thigh; she has to use a cane; her "condition is disabling"; as to work requiring her to be on her feet, "there are some things she could do. I don't think that she could compete very well in the open market unless they were exceptionally kind in taking on people that have age or disability. She could not stand for any prolonged period of time," and she cannot sit comfortably because of the leg's stiffness.
Plaintiff's Instruction No. 6 was that the jury, "in estimating and determining her damage," should consider the nature and extent of her injuries, whether such injuries were permanent, physical pain and mental anguish theretofore suffered and thereafter to be suffered, "any impairment *398 of her ability to work and earn money hereafter," hospital and medical expenses, and earnings theretofore lost, "and you should award her such sum in damages as * * * will fairly and reasonably compensate plaintiff for all her injuries, * * * and your entire award * * * should be stated in one sum * * *." (Our italics.) Note that plaintiff submitted loss of earnings only to date of trial. Also note that she did not submit both loss of future earnings and permanent impairment of earning capacity, both of which she had pleaded. See Davidson v. St. Louis Transit Co., 211 Mo. 320, 109 S.W. 583, 589[1].
"It is the law, well accepted, that a permanent injury is in itself, aside from the pecuniary loss, an element of damages." Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161, 167[6, 7]. Defendant does not contend that the instruction was erroneous because of the insufficiency of the evidence as to the permanency of plaintiff's injuries. Nor does defendant complain of the sufficiency of the evidence as to either the the impairment of her earning capacity or her loss of future earnings. Defendant says that the instruction "allowed double damages," viz., for both permanent injuries and present "impairment of ability to work and earn money hereafter."
Defendant quotes thus from Wolfe v. Kansas City, 334 Mo. 796, 68 S.W.2d 821, 825[1]: "Present impairment of earning capacity is included in the compensation for the injuries themselves and the submission of a recovery for such injuries plus such impairment is clearly a submission of double compensation." (Our italics.) The court was then discussing Davidson v. St. Louis Transit Co., 211 Mo. 320, 109 S.W. 583, wherein the plaintiff was a widow at trial time; and an instruction submitting "`probable impairment of earning capacity in the future'" was held erroneous "for the reason that there was no testimony upon which to predicate such an instruction." 211 Mo. loc. cit. 345, 109 S.W. loc. cit. 589[1]. The Davidson case instruction did not submit impairment of earning capacity plus loss of future earnings. As pointed out in the Wolfe case, "`impairment of earning capacity in the future'" was construed (in the Davidson case) as meaning "probable loss of time or earnings in the future," requiring evidence "tending to show what her probable loss of earnings in the future would have been." 68 S.W.2d loc. cit. 825[2].
In the Wolfe case, the submission of "the impairment, if any, of her power to earn money" of a married woman was held not erroneous, although not supported by evidence of loss of future earnings. The court construed that language as meaning the present impairment of earning capacity rather than loss of future earnings. See 68 S.W.2d loc. cit. 825[3]. And see Becker v. Lincoln Real Estate Co., 118 Mo.App. 74, 93 S.W. 291, 294, wherein the plaintiff was a married woman who had been abandoned by her husband, and the submission was "impairment of health or strength and physical disability to labor and earn money by her separate labor". This was held erroneous because of the absence of evidence showing that she could earn money by her separate labor.
Defendant also cites Murphy v. St. Louis Public Service Co., 362 Mo. 772, 244 S.W. 2d 31, wherein the plaintiff (like instant plaintiff) had pleaded both loss of future earnings and permanent impairment of earning capacity, and did not submit both items. The court found that there was no substantial evidence to sustain the plaintiff's claim of "loss of time and * * * wages" (future earnings) and said: "The instant plaintiff was an adult man and under the record his earning capacity was susceptible of reasonably accurate proof whether the element of damages be viewed as a loss of time or as an impairment of earning capacity." 244 S.W.2d loc. cit. 36[9]. In other words, if "impairment of earning capacity" be construed as loss of earnings in the future, the submission was not supported by evidence; and if "impairment of earning capacity" be construed as present loss of capacity to earn money, then the submission was of an item included in the damages for the permanency of the injuries themselves.
Returning to instant Instruction No. 6, authorizing allowance for both permanency of injuries and "impairment of *399 ability to work and earn money hereafter." Under the evidence, the jury reasonably would understand this submission only as meaning loss of future earnings and not as present impairment of earning capacity. It follows that the instruction did not "allow double damages." Warning v. Thompson, 363 Mo. ___, 249 S.W.2d 335, 342[11].
The judgment is affirmed.
VAN OSDOL and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.