Perry **HUFFMAN**, Respondent,

v.

Frank **MERCER**, Appellant.

No. 45161.

Supreme Court of Missouri.

Division No. 2.

Sept. 10, 1956.

Rehearing Denied Nov. 12, 1956.

John T. Martin, Sedalia, Martin & Gibson, Sedalia, of counsel, for defendant-appellant.

George H. Miller, Sedalia, C. P. Junge, Cole Camp, for respondent.

BOHLING, Commissioner.

Perry Huffman sued Frank Mercer for personal injuries to himself (Count I) and for the death of his wife, Dora (Count II), the result of an automobile collision. A judgment, in conformity with a ten-juror verdict, was entered against defendant for $16,000 on Count I and for $15,000 on Count II. Defendant has appealed and contends there was "no substantial evidence of probative value" to support the verdict and judgment; that the verdict on each count is so grossly excessive as to indicate passion and prejudice on the part of the jury and require a new trial; and, if not, in any event a remittitur should be entered on each count.

Plaintiff predicated a verdict upon a finding that defendant negligently "drove his truck to the left and across the center line of said pavement and into the lane of westbound traffic then being occupied by plaintiff's car" and against the plaintiff's car, and thus injured plaintiff. See Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91, 93 [1–5].

Defendant's theory was that plaintiff, when within a short distance of defendant's truck, suddenly crossed to the south edge of the pavement and then suddenly turned his car back toward its proper lane of traffic, blocking defendant's lane of travel, and that the collision occurred near but south of the center of the pavement and in defendant's lane of travel.

Plaintiff had been living in Windsor, Mo., for three or four months, and resided with his wife, Dora, on E. I. McCown's farm, three miles south of Windsor. He worked for McCown on the farm in the mornings and at McCown's junk yard in the afternoons. He had purchased a 1936 Ford, "an old wreck" of a car, from McCown a few months before the accident, paying $25 or $50 for it. He testified that the steering apparatus of the car was all right, but the front wheels had shimmied ever since he purchased it.

Defendant was a "trucker," and had four trucks hauling chat for the city from a quarry west of Windsor for use on the streets. He was operating a 1951 General Motors truck eastwardly at the time of the accident. It weighed 6,900 pounds and was loaded with 14,000 pounds of chat, rounded up on top of the truck.

The accident occurred Thursday, July 9, 1953, about 5 p. m. and 7 miles west of Windsor, Missouri, on State Highway No. 2, an east-west macadam (blacktop) road, 22 feet in width. The center of the pavement was marked by a painted line, badly worn and rather indistinct but discernible. At the scene of the accident, the highway for westbound traffic is downgrade to a

culvert at the bottom of a hill and then upgrade for about 1,000 feet to the crest of the hill on the west.

Plaintiff had promised to take Virgil Wilson, a friend, to near Lexington to collect $6 a man owed Wilson, and plaintiff and his wife intended to visit her folks at Carrollton. Plaintiff performed his chores at the farm on the morning of July 9, 1953. He was not feeling good and had not worked in the afternoons for a couple of days. Plaintiff, his wife, and Wilson spent the afternoon visiting at plaintiff's father's home.

At the scene of the accident, plaintiff's Ford was followed by one of defendant's trucks, westbound for another load and operated by Lee Douglas. Plaintiff was driving, his wife was seated in the middle and Wilson was to her right. John C. Brown, an instructor at the Windsor High School, was working on his Master's degree at the State Teacher's College and commuted between Windsor and Warrensburg. He had passed defendant near the hill in question and was traveling east several hundred feet ahead of defendant down the west slope of the hill.

Plaintiff testified his Ford would shimmy "whenever it would hit a little dip" or "when it would hit a bump in the road," and that Highway No. 2 was pretty wavy in places. Whenever it shimmied he would "jerk" the Ford to the left and jerk it back to the right and get it straightened up, but would never go over two or three feet across the center line.

Plaintiff testified he met an eastbound (Brown's) car before he reached the culvert; that after they passed his Ford started to shimmy again and he jerked it again; that after he crossed the culvert the Ford started to shimmy again and he jerked it two or three feet over the center line and then back again and got it straightened up; that he was then about 200 feet west of the culvert, the Ford was com-

pletely over on his, the north, side of the highway, and he first saw the truck about 900 feet away. He placed the Ford's right wheels on the shoulder, at the edge of the blacktop where there was some gravel and dirt, not on the grass, with the left wheels about 6 feet north of the center line. He stated the truck was weaving, not shimmying, back and forth across the center line; that the Ford was proceeding at the north edge of the blacktop; that when the truck got close, 50 or 60 feet away, he noticed its left front tire was low, "getting pretty well flat, it looked to me like"; that Wilson said "Watch out," and that the truck came over on plaintiff's side of the road and the front end of the truck struck the Ford at about the hinge of its left door, and pushed the Ford 15 or 20 feet back into the ditch and against the bank on the north side of the highway.

Defendant placed the collision about 600 feet from the west crest of the hill.

Virgil Wilson corroborated plaintiff's testimony. He stated the truck had a "flat tire"; and that when the Ford shimmied "it would shake the whole body."

Plaintiff estimated his speed at 25 to 30 m. p. h., which accorded with defendant's estimate, and defendant's speed at 55 to 60 m. p. h. Defendant testified he was traveling about 45 m. p. h. as he approached the point of collision, and had slowed to 35 to 40 m. p. h. at the point of impact.

Lee Douglas, operating defendant's westbound truck and defendant's witness, testified he caught up with and followed the Ford for about two miles; that he undertook to pass it once or twice but the Ford would cross over to the south edge of the blacktop and he stayed behind it.

Mr. Brown, defendant's witness, testified that as the Ford and his car approached each other, the Ford crossed to the south side of the pavement twice, and on the second occasion forced him to move and take a chance of going into the ditch. He

described the movements of the Ford as sharp enough to make the Ford swerve and lean a little.

Defendant testified his truck was not "weaving." He noticed the Ford suddenly swerve after passing Brown's car, "nearly" go into the ditch on the south side of the road, and suddenly pull back to its side of the road. He released his pressure on the accelerator and continued on as the Ford was on its side of the highway. When the truck and the Ford were about 100 feet apart, the Ford again suddenly and abruptly swerved to the south edge of the blacktop. He thought it was going into the ditch. The Ford, however, suddenly made an abrupt turn back to the north, and was headed northwest, diagonally across and blocking the eastbound traffic lane. He applied his brakes for 75 to 80 feet. The left front of the truck, when about two feet south of the center line, struck the Ford just behind its left front wheel. The impact broke the brake lines on the truck; his brake pedal went to the floor board, and the two cars came to a stop in the ditch on the north side of the road. After the collision the left front tire and tube of the truck had a six to eight inch cut in them. The tire remained on the rim of the wheel and the rim was not damaged in any way.

Lee Douglas corroborated the testimony of defendant and his witness Brown.

Plaintiff, defendant, and defendant's witness Douglas testified that when the collision occurred chat and dust (the chat was rounded up above the bed of the truck) "flew everywhere." Defendant testified the collision was severe; that "when they came together there was so much dust, gravel [chat] flying, that, of course, I couldn't see anything, I couldn't even tell where we was going until it stopped"; and that some of the chat broke the rear window of the truck's cab and the cab had about eight inches of chat in it.

Defendant's Exhibit 1 is a photograph taken on the afternoon of the accident and admittedly represents the scene as it appeared right after the accident. It shows gouged-out lines in the blacktop and also the chat on the blacktop.

Several witnesses testified to marks on the blacktop, especially Highway Patrolman Wayne Allman, plaintiff's witness, who arrived at the scene two hours after the accident, and defendant. The truck's dual rear wheels left skid marks on the blacktop. The skid marks started in the normal driving position for defendant's truck and angled toward the center of the blacktop. Allman testified the skid mark or marks were 51 feet long. The skidmarks ended where two "gouged-out" marks or lines commenced, "like some piece of metal" had dug into the blacktop. The gouged-out lines started just south of the center line and were approximately 12 to 18 inches apart at that point. The line to the south was short, but the other extended some distance in the direction where the two cars ended in the ditch on the north side of the road. Defendant stated the impact occurred at the west end of the gouged-out lines, and marked the point where the brake lines of the truck were severed. Allman examined the truck and the Ford but found nothing on either automobile to which he could attribute the gouged-out marks.

Allman testified that the distance from the beginning of the gouged-out lines to the radiators of the cars after the collision was 120 feet; that both lanes of the blacktop were covered with chat for 20 or 30 feet, and that the back end of the truck was almost at the west end of the chat. Defendant placed the rear of the truck about "20, 30 feet" east of where the chat began. Defendant's Exhibit 1 established that there was no chat on the pavement where the gouged-out lines began, or for a number of feet east of where the long gouged-out line ended. Defendant testified he did not see any chat up where the gouged-out lines were.

I. Defendant contends there was no substantial evidence of probative

value to support plaintiff's judgment. We review the evidence on this issue, briefly stated, from a standpoint favorable to plaintiff to determine whether there is substantial evidence upon which the jury could reasonably reach its verdict, and defendant's conflicting oral testimony is immaterial. Hopkins v. Kurn, 351 Mo. 41, 171 S.W.2d 625, 632 [5], 149 A.L.R. 762; Lansford v. Southwest Lime Co., Mo., 266 S.W.2d 564, 567 [3–6]; Weaver v. Mobile & O. R. Co., 343 Mo. 223, 120 S.W.2d 1105, 1110 [6, 7]. See Machens v. Machens, Mo., 263 S.W.2d 724, 734 [16]. The credibility of a witness is for the jury, and ordinarily the jury may believe or reject in whole or part the testimony of any witness, especially where the evidence on a fact issue conflicts. Gould v. Chicago, B. & Q. R. Co., 315 Mo. 713, 723, 290 S.W. 135, 138 [2]; Birmingham v. Kansas City Pub. Serv. Co., 361 Mo. 458, 235 S.W.2d 322, 327 [7].

A and B. Defendant argues, first, that the physical facts establish that the collision occurred on the south, defendant's side of the pavement, as testified to by defendant's witnesses, and not on the north, plaintiff's side of the pavement, as testified to by plaintiff's witnesses; that the oral testimony of plaintiff and his witness Wilson is in plain contravention of the physical facts and should be disregarded by the court in passing upon the sufficiency of the evidence to sustain the verdict, Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, 891 [1–4]; Mahl v. Terrell, 342 Mo. 15, 111 S.W.2d 160, 161 [1, 2]; Laughlin v. Boatmen's Nat. Bk., Mo., 163 S.W.2d 761, 764; Carner v. St. Louis-S. F. R. Co., 338 Mo. 257, 89 S.W.2d 947, 950 [5]; that this rule of evidence applies where the physical facts fix the place of collision at one point and oral testimony attempts to fix it elsewhere, 10 Blashfield, Automobile Law, (1955), 381, § 6554, nn. 50, 50.5; Lessig v. Reading Tr. & L. Co., 277 Pa. 299, 113 A. 381; and, second, since the physical facts fix the point of collision on the south side of the pavement and demon-

strate the oral testimony on behalf of plaintiff to be unworthy of belief, that this court should enter judgment for defendant or grant defendant a new trial. Ducoulombier v. Thompson, 343 Mo. 991, 124 S.W.2d 1105, 1110 [5–7]; Weaver v. Mobile & O. R. Co., 343 Mo. 223, 120 S.W.2d 1105, 1110; Clark v. Atchison & E. Bridge Co., 333 Mo. 721, 62 S.W.2d 1079, 1081 [4–6].

Defendant stresses certain exhibits (photographs) and testimony establishing that skid marks of the truck's dual rear wheels, commencing in the south half of the pavement, extended northeasterly for about 51 feet to where the gouged-out lines began near but south of the center line and continued across the center line in a northeasterly direction for some distance in the direction where the cars stopped in the ditch on the north (plaintiff's) side of the road, with their radiators 120 feet east of where the gouged-out lines began. Reasoning that there was nothing on the Ford or the truck prior to the collision which could have made these gouged-out marks and stressing a photograph of the cars before they had been moved following the collision and plaintiff's witness Allman's testimony that he could recall nothing down on the truck that could have caused the gouged-out marks, defendant says said marks can logically be accounted for only on the theory the truck overrode the Ford, twisted the Ford's front axle through nearly a ninety degree angle, and undoubtedly forced parts of the Ford down and into the blacktop. Allman also testified that there was nothing on either car which he could determine as having made the marks. Plaintiff testified that the black line, gouged-out marks, about represented the course of the truck in crossing from the south to the north side of the pavement.

■ Defendant also says that the absence of chat on the pavement at the beginning of the gouged-out marks, is not inconsistent with his conclusion. However, the absence of chat at this point is a factor; and defendant's presentation does not give

consideration to defendant's testimony and the testimony of defendant's witness Douglas, as well as the testimony on behalf of plaintiff, that at the instant of impact chat, which had been rounded up on the truck bed, "flew everywhere"; that the pavement for 20 to 30 feet opposite where the cars stopped in the ditch was covered with chat, and that there was no chat on the pavement where the gouged-out lines began or for some distance, we think the jury could infer 60 or more feet, east thereof. While we may be of the opinion the verdict is against the weight of the evidence, we cannot say as a matter of law that the plaintiff's Ford was not on its side of the pavement when struck by defendant's truck. If, as authorized under the evidence favorable to plaintiff, plaintiff had been operating his Ford on his side of the highway for several hundred feet prior to and at the time of the collision, the jury could find defendant negligent if the truck collided with the Ford on the north, the Ford's side of the highway.

■■■ C. Defendant also argues that he was not guilty of actionable negligence as plaintiff's evidence shows the alleged veering of defendant's truck onto the north side of the pavement was caused by a "flat tire" on its left front wheel, citing Borrini v. Pevely Dairy Co., Mo.App., 183 S.W.2d 839, 845 [7, 8]; Lochmoeller v. Kiel, Mo.App., 137 S.W.2d 625, 630; Seligman v. Orth, 205 Wis. 199, 236 N.W. 115, 116 [3], stressing the following from Seligman v. Orth: "If one be precipitated to the left of the road by virtue of circumstances [a blowout] over which he has no control, one is not negligent." We find no fault with the general principle advanced by defendant, but consider the instant case distinguishable on the facts. In Seligman v. Orth, the duty of the defendant was the exercise of ordinary care. There was testimony warranting a finding that the Orth car was caused to cross the center line a short distance in front of a plaintiff's automobile by reason of a blowout of its left front tire, and the jury returned a verdict

for the defendant, finding defendant not negligent. The Lochmoeller case is like the Orth case on the issue, and the jury exonerated the defendants. In the Borrini case plaintiff's testimony indicated that defendant was confronted with a sudden emergency to avoid a head-on collision with the Borrini car, and there was no evidence that defendant was negligent in doing what he did. We think the instant case is sufficiently distinguished from defendant's cases in that, under the evidence favorable to plaintiff, there were no sufficient facts upon which to excuse a collision between the two cars on the Ford's side of the road. Plaintiff testified that the truck had been weaving and after it "got pretty close to me, where I could see, why, I noticed it had a low tire," and he estimated it was 50 or 60 feet away at that time. Plaintiff's testimony did not compel a finding that the truck had a flat tire or a "blowout."

II. Defendant makes the points that the verdict and judgment on each count and "in the aggregate" is so grossly excessive "as to indicate bias, prejudice and passion on the part of the jury and a new trial should be granted." No authority is cited. Defendant's argument stresses his points seeking a remittitur in this court and the authorities cited bear on that issue. In O'Brien v. Louisville & N. R. Co., 360 Mo. 229, 227 S.W.2d 690, 693 [6], plaintiff had a verdict of $100,000 for personal injuries. The trial court required a remittitur of $45,000 and judgment was entered for $55,000 which was further reduced in this court to $30,000 as a condition for affirmance of the judgment. In overruling defendant's contention that the verdict of $100,000 was so excessive as to show passion and prejudice on the part of the jury, we referred to cases wherein new trials were not granted but remittiturs were required reducing verdicts one-half or more; for instance: From $12,500 to $4,500; from $45,000 to $15,000; from $18,800 to $8,800; from $40,000 to $18,000; from $85,000 to $35,000; from $41,375 to $10,-000. Defendant has not established such

error as to require the granting of a new trial by this court. O'Brien v. Louisville & N. R. Co., supra; Carver v. Missouri-K.-T. R. Co., 362 Mo. 897, 245 S.W.2d 96, 106 [30].

III. The approach of appellate courts to the issue of the excessiveness of a judgment is restricted. A trial court exercises a wide discretion in weighing the evidence and placing its own evaluation upon all the evidence bearing upon the issue. Appellate courts determine the issue as one of law, do not weigh the evidence, or pass on the credibility of the witnesses. Sanders v. Illinois C. R. Co., 364 Mo. 1010, 270 S.W.2d 731, 737 [4 et seq.], and authorities cited; Scneder v. Wabash R. Co., Mo., 272 S.W.2d 198, 208 [15, 16]; Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935, 940 [10, 11].

A. Does the 16,000 judgment for personal injuries require a remittitur in this court?

Plaintiff, aged 33, had been in Windsor three or four months working on a farm in the mornings and a junk yard in the afternoons for E. I. McCown. Asked how much money he received, he answered: "Around $125 a month it all figured up to." He was given a home and had some other privileges at the farm. He had an eighth grade education and was a common laborer. Prior to the accident he was in good health. He had worked "off and on" at various places "all over the country," and after working a while would lay off and loaf for two or three weeks. Sometimes he "vacationed" around with his relatives for several months, helping them. He worked for a carnival "off and on" for eight years. After the accident and up to the time of trial (twenty-two months) he had worked for about two months in a sitting position.

The neck of plaintiff's left femur, where it rotates in the pelvic bone, was snapped completely off and shoved against the pelvis. An open reduction was performed. A large pin was driven into the head of the femur to hold the bones in position. They discovered 12 or 13 days later that it had slipped by reason of the muscle pull and the procedure had to be repeated. The leg is ¾ths to 1 inch shorter than the other, and there is definite limitation of leg motion. He sustained lacerations over his face and arms, wrists and hands, with chipped glass and other debris in the wounds. They sutured lacerations over his eye, on a cheek, at the corner of his mouth, on his arms, left elbow, one at least about 2½ inches long, and his hands. He had a 4-inch cut on one of his knees that went to the bone. He had a bad bruise, a hematoma, on the inside of his right leg between the knee and hip. He testified he had and still suffered pain in his left leg particularly, could stand no weight on it, that his lower back hurt, and he had trouble with his shoulders and was nervous. The physician, however, did not find any marked area of muscle spasm which usually accompanies any consequential back injury. The physician testified plaintiff sustained permanent injury to his nervous system; that he would continue to have pain and discomfort; that the normal blood supply will never return to his hip, and that the injury to plaintiff's hip permanently disabled him from doing "any type of heavy or I would say normal manual labor." Plaintiff was in the hospital 22 days and spent several months at his father's home after his release from the hospital. He incurred a doctor bill of $225 and a hospital bill of $411.

Stating he had not found cases sufficiently parallel on the facts to afford an accurate guide, defendant cites the following in support of his position: Mrazek v. Terminal R. Ass'n, 1937, 341 Mo. 1054, 111 S.W.2d 26, 31, reducing a $15,000 judgment to $10,000; O'Brien v. Vandalia Bus Lines, Inc., 1943, 351 Mo. 500, 173 S.W.2d 76, 78, reducing a $15,000 judgment to $12,500; and Willis v. Atchison, T. & S. F. R. Co., 1944, 352 Mo. 490, 178 S.W.2d 341, 347, a verdict for $15,000 was reduced to $12,000 in the trial court and to $10,000 in

this court. As usual, we find no cases in exact parallel to the facts here involved. After studying defendant's cases and those cited by plaintiff, where there were facts justifying a higher award, and giving consideration to the injuries sustained by plaintiff, the economic factors of which judicial notice is taken, Venditti v. St. Louis Pub. Serv. Co., 1951, 362 Mo. 339, 240 S.W. 2d 921, 930, and a reasonable uniformity in awards, an affirmance of the judgment on Count I should not be conditioned upon the entry of a remittitur. Christiansen v. St. Louis Pub. Serv. Co., 1933, 333 Mo. 408, 62 S.W.2d 828, 833, $18,000 reduced to $15,000; McKnight v. St. Louis Pub. Serv. Co., Mo.1951, 235 S.W.2d 560, 564, sustaining a judgment for $15,000; Berry v. Emery, Bird, Thayer D. G. Co., 1948, 357 Mo. 808, 211 S.W.2d 35, 43, $30,000 reduced to $18,000; Sams v. Adams Transfer & S. Co., Mo.1950, 234 S.W.2d 593, 596, sustaining a judgment for $10,000. Consult also Pettis v. St. Louis Pub. Serv. Co., Mo.1951, 240 S.W.2d 909, 913; Lindsey v. Williams, Mo.1953, 260 S.W.2d 472, 478 [3–5].

B. Defendant contends the $15,000 judgment for the death of plaintiff's wife, the maximum then allowable under § 537.090, RSMo 1949, V.A.M.S., should be reduced by remittitur; and argues that § 537.090 limits a recovery to the pecuniary loss sustained and no allowance may be made for loss of the companionship or society of the deceased. Parsons v. Missouri P. R. Co., 94 Mo. 286, 294(III), 6 S.W. 464, 466(3); Truesdale v. Wheelock, 335 Mo. 924, 74 S.W.2d 585, 591 [10]; Montgomery v. Ross, Mo., 218 S.W.2d 99, 103; Szofran v. Century Elec. Co., Mo.App., 255 S.W.2d 443, 450 [10].

Defendant states: "The results in the following cases demonstrate the excessiveness of the award in question." Bulkley v. Thompson, 240 Mo.App. 588, 211 S.W.2d 83, 91; Byram v. East St. Louis R. Co., Mo.App., 39 S.W.2d 376, 381; Adams v. Thompson, Mo.App., 178 S.W.2d 779, 781. Defendant's cases do not rule the issue.

The first two cases upheld verdicts and judgments for $7,000 for the negligent death of a wife, and in the Adams case the propriety of a verdict and judgment for $5,500 was not questioned. The cases are not holdings that a verdict and judgment for greater amounts would have been held excessive.

Wente v. Shaver, 350 Mo. 1143, 169 S.W.2d 947, 954 [9], 145 A.L.R. 1176, quotes with approval: "'* *. * wherever there exists a reasonable probability of pecuniary benefit to one from the continuing life of another, however arising, the untimely extinction of that life raises a presumption of pecuniary injury." The evidence established that plaintiff and his wife, Dora, had been married for about eight years; that they had no children; that they were happily married; that she was in good health, 25 years of age, and that plaintiff was 33. She died about 10 p. m. July 9, 1953, from injuries received in the collision. In Benton v. Thompson, 236 Mo.App. 1000, 156 S.W.2d 739, 747 [15], certiorari quashed State ex rel. Thompson v. Shain, 349 Mo. 1075, 163 S.W.2d 967, a verdict of $5,000 for the death of a 73 year old widow was upheld. In defendant's case of Bulkley v. Thompson, supra, where there was more testimony of the wife's activity than in the instant case, an award of $7,000 to a 77 year old husband for the negligent death of his 73 year old wife was upheld. The statutory limit is not meant to be the maximum value of a human life, but fixes the maximum within which the jury may exercise a broad discretion. Steger v. Meehan, Mo., 63 S.W. 2d 109, 113 [10–12]; Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S.W.2d 115, 121 [11]. In Brewert v. Rowe, 363 Mo. 592, 252 S.W.2d 372, a $15,000 verdict was permitted to stand for the death of an 11 year old boy, and in McCrary v. Ogden, Mo., 267 S.W.2d 670, 671, a $10,000 verdict for the death of a 17 year old boy was upheld. The instant situation is much like that mentioned in Honea v. St. Louis I. M. & S. R. Co., 245 Mo. 621, loc. cit. 646,

151 S.W. 119, loc. cit. 125. Under the above authorities, defendant has not established that a remittitur should be exacted.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER.CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.

On Motion for Rehearing.

PER CURIAM.

Defendant's motion for rehearing questions the holding in paragraph I, C, of the opinion upon the ground plaintiff's trial theory was and plaintiff's evidence established that defendant was precipitated onto the wrong side of the highway and against plaintiff's automobile as the result of a blowout or flat tire, and, therefore, defendant was not actionably negligent.

Defendant also states we did not consider the following cases cited in his brief, to wit: Klein v. Beeten, 169 Wis. 385, 172 N.W. 736, 737, 5 A.L.R. 1237; Byerly v. Thorpe, 221 Wis. 28, 265 N.W. 76, 78; Zarrillo v. Stone, 317 Mass. 510, 58 N.E.2d 848; Otto v. Sellnow, 233 Minn. 215, 46 N.W.2d 641, 642, 645, 24 A.L.R.2d 152; Eubanks v. Kielsmeier, 171 Wash. 484, 18 P.2d 48, 51; Giddings v. Honan, 114 Conn. 473, 159 A. 271, 272 [7], 79 A.L.R. 1215. These cases involved an accident attributable to a blowout, or sudden deflation of an automobile tire, or, as in the Byerly case, what the court considered the equivalent of a blowout. They were considered and are in accord with the case of Seligman v. Orth, 205 Wis. 199, 236 N.W. 115, 116 [3], mentioned in the opinion and stressed by defendant, which case is illustrative of defendant's above cited cases.

Defendant stresses excerpts from the record to the following effect: From plaintiff's counsel's opening statement to the effect that defendant's truck [traveling 50 to 60 m. p. h.] suddenly started to cross into plaintiff's lane of travel when within 150 to 200 feet of plaintiff's car [traveling 25 to 30 m. p. h.] and when 100 to 130 feet away plaintiff noticed the truck's left front tire was "either flat or low," "flat or extremely low." After the accident the tire was "flat." And, from plaintiff's testimony: Plaintiff saw defendant's truck coming down the hill, weaving back and forth across the center line of the highway; and when it was close enough to see, he noticed the tire on the truck was low. On cross-examination: Defendant's truck was 50 to 60 feet away when plaintiff "noticed the tire." Plaintiff had noticed the truck weaving back up the hill but couldn't see until it came closer "that his tire was getting low"; "was going down, pretty well down"; "getting pretty well flat, it looked to me like."

Plaintiff also testified that he first saw the truck when it was "around 900 feet" from his car and: "Q. All right. Now, you say this truck was weaving as it came down the road? A. Absolutely. Q. Were its wheels shimmying? A. No, he was weaving."

■ Plaintiff was not conclusively bound by the testimony, damaging, if so, to plaintiff, of his witness Virgil Wilson, stressed by defendant, that the left front tire of the truck "was plumb flat," if such testimony conflicted, expressly or by inference, with other evidence on behalf of plaintiff. Hoffman v. Peerless White Lime Co., 317 Mo. 86, 296 S.W. 764, 773 [15]; Killinger v. Kansas City Pub. Serv. Co., Mo., 259 S.W.2d 391, 395 [2]; Suarez v. Thompson, Mo., 283 S.W.2d 584, 586 [1].

■ From the testimony and permissible inferences most favorable to plaintiff the jury could find that defendant continued to operate his truck in plaintiff's view weaving back and forth across the center

line of the highway with a low left front tire for several hundred feet; and that plaintiff did not notice that the left front tire of defendant's truck was low or pretty well flat until it was within 50 or 60 feet of plaintiff's car. After again reviewing the record, we conclude plaintiff's evidence did not compel a finding that a blowout or a suddenly deflated tire, the equivalent of a blowout, was the sole cause of the truck crossing the center line of the highway and striking plaintiff's car; i. e., that the collision was an unavoidable accident exonerating defendant of negligence in the operation of his truck. Setting aside verdicts against the weight of conflicting probative evidence is a function reserved for the trial courts. State ex rel. Kansas City Public Service Co. v. Bland, 353 Mo. 1234, 187 S.W.2d 211 [6]; Wilcox v. Coons, 362 Mo. 381, 241 S.W.2d 907 [25]; Clark v. City of Springfield, Mo.App., 241 S.W.2d 100 [2].

The motion for rehearing is overruled.